UNITED STATES of America,
Plaintiff-Appellee,

v.

Oakley G. SMITH,
Defendant-Appellant.

No. 74–2343.

United States Court of Appeals,
Fifth Circuit.

Nov. 17, 1975.

As Amended on Denial of Rehearing and
Rehearing En Banc Feb. 13, 1976.

Paul A. Louis, William A. Meadows, Jr., Phillip T. Weinstein, Paul Siegel, Neil A. Shanzer, Sinclair, Louis & Siegel, Miami, Fla., for defendant-appellant.

Ronald Rose, Gary L. Betz, Sp. Attys., Dept. of Justice, Miami, Fla., Thaddeus B. Hodgdon, Crim. Div., App. Section, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BELL, DYER and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Oakley G. Smith was charged in a nine count indictment with having violated three federal statutes, one count relating to each offense for each of three successive years. Counts One through Three alleged appellant had, in violation of Title 18, U.S.C. Section 1001, made false statements as to a material matter within the jurisdiction of the United States Department of Health, Education and Welfare; Counts Four through Six charged him with making and subscribing to false income tax returns for an exempt organization, Palm Springs General Hospital, in violation of Title 26, U.S.C. Section 7206; and Counts Seven through Nine charged him with willfully attempting to evade personal income tax, contrary to the provisions of Title 26, U.S.C. Section 7201.[1] Appellant was found guilty, following a jury trial, on Count Three, willfully making false statements in a matter within the jurisdiction of H.E.W. in the fiscal year 1971.[2] He was found not guilty on the other eight counts. Post-trial motions for judgment of acquittal (renewing motions made at the close of the government's case and again at the close of the evidence), for new trial and in an arrest of judgment were denied; judgment of conviction and sentence[3] followed. Smith appeals from the judgment and sentence.

Appellant urges reversal of his conviction on several grounds: (1) that the trial judge erred in not granting defendant's motions for acquittal because the evidence was insufficient to support the verdict; (2) that Count Three of the indictment should have been dismissed as being vague and indefinite, and that the proof was at variance with the false statement alleged; (3) that the appellant was denied due process by the prosecution's charging him with a felony in that the conduct for which he is charged is more specifically proscribed by a misdemeanor statute; (4) that the grand jury which returned the indictment was unconstitutionally composed; (5) that the jury's verdict was inconsistent, and (6) that the appellant was the target of discriminatory prosecution. Our examination of the record in light of the points raised by appellant convinces us that for the reasons cited herein they are without substance. We affirm.

The primary contentions pressed upon us by the appellant are questions relating to the sufficiency of the evidence. Section 1001 requires the "knowing and willful" misrepresentation of a

---

1. The time periods involved did not precisely overlap for each crime charged, due to different fiscal years. Thus the Section 1001 violations were for Medicare fiscal years ending June 30, 1969 through 1971. The tax years of Palm Springs ended September 30, 1969, 1970 and 1971. Smith's personal income tax returns were filed on a calendar year basis, the tax years involved ending December 31, 1969, 1970 and 1971.

2. Title 18, Section 1001, provides:

 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsi-

fies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. The sentence was to three years confinement and a fine of $7500, with 75 days only of confinement, the balance probated under the split sentence provision of Title 18, U.S.C. Section 3651.

material fact within the jurisdiction of any department or agency of the United States. "Knowingly" as used in Section 1001 requires only that the defendant acted "with knowledge". *United States v. Mekjian*, 5 Cir. 1975, 505 F.2d 1320, 1324; *McBride v. United States*, 5 Cir. 1955, 225 F.2d 249. "Willfully" means the defendant acted "deliberately and with knowledge". *United States v. Mekjian*, supra; *United States v. Parten*, 5 Cir. 1972, 462 F.2d 430; *McBride v. United States*, supra. Appellant contends the evidence in this case is insufficient to support the jury's finding of the requisite *mens rea*. This requires a detailed recitation of the facts of the case, as shown by the evidence.

## I. SUFFICIENCY OF THE EVIDENCE

We examine the sufficiency of the evidence in the light most favorable to the government in substantiation of the charge. *Glasser v. United States*, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704; *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, 825; *Jones v. United States*, 5 Cir. 1968, 391 F.2d 273, 274. "All reasonable inferences and credibility choices as will support the jury's verdict of guilty must be made". *United States v. Black*, 5 Cir. 1974, 497 F.2d 1039, 1041. Our responsibility in a case based upon circumstantial evidence is to determine whether reasonable minds could conclude that the evidence presented at trial is inconsistent with the hypothesis of the accused's innocence. *United States v. Black*, supra; *United States v. Amato*, 5 Cir. 1974, 495 F.2d 545; *United States v. Edwards*, 5 Cir. 1974, 488 F.2d 1154; *United States v. Fontenot*, 5 Cir. 1973, 483 F.2d 315, 321; *United States v. Warner*, supra. It is for the jury to determine the guilt or innocence of a defendant; an appellate court should not interfere unless it concludes that the jury must necessarily have had a reasonable doubt. *United States v. Black*, supra; *United States v.*

*Fontenot*, supra; *United States v. Warner*, supra. These principles guide us in our consideration of the facts as established by the evidence.

The appellant, Oakley G. Smith, was president and chairman of the Board of Trustees of Palm Springs General Hospital at Hialeah, Florida (PSGH, or the hospital). PSGH was a non-profit tax-exempt institution, which participates as a "provider" hospital in the Medicare program. Medicare is a program of the United States Department of Health, Education and Welfare (HEW), more specifically, the Social Security Administration.[4] Blue Cross had a contract to administer the program for HEW.[5] In order to be reimbursed by HEW for health care rendered to medicare patients, PSGH must file cost reports with Blue Cross annually, listing all expenses incurred in rendering patient care for that year. The amount due the hospital annually from HEW is determined by multiplying these total health care expenses by the percentage of Medicare patient days to total patient days for that year. Appellant, as chief hospital administrator, was responsible for the filing of PSGH cost reports with Blue Cross, and did so annually. These cost reports, Forms 1563, 1562 and 1992 for fiscal year 1971 are the claimed false statements as to material fact forming the basis for Count Three of the indictment.

Testimony established that Smith knew the general method by which the Medicare reimbursement program worked, and had in fact been instrumental in bringing the program to the hospital. Smith made it a practice to retain complete financial control of the hospital. The jury had testimony before it which indicated that Smith knew that any distortion in the hospital's books would cause a corresponding distortion of the Medicare reports. The critical question of proof in this case is therefore the extent of Smith's knowledge that improper costs were included in the hospital's books as reported to Medicare.

---

4. Title 42, U.S.C. Section 1395 et seq. (1970).

5. Blue Cross of Florida, Inc., is a private insurance carrier.

The prosecution, at trial, focused its proof on three highly irregular transactions, each of which was reflected in the hospital's total costs as reported to Blue Cross. Two of these expenses are argued by appellant to have been the result of a "mistake" on the part of Smith or that of hospital employees. The other expense is characterized by Smith as reflecting a legitimate hospital expense. We hold here that the jury had evidence before it justifying a finding that each transaction was not a legitimate patient care expense, or mistake, but was instead the result of an intentional act on Smith's part.[6]

In October 1968, appellant began the remodeling of his home on Miami Beach. He hired an employee of the hospital to be foreman of the work and to order supplies through the hospital.[7] Arango, a government witness, the comptroller of the hospital, testified that early in 1969 he noticed invoices coming to the hospital with Smith's Miami Beach home shown as the delivery address of the goods. When he inquired as to these invoices Smith told him to pay them, but to "segregate" those expenses from other hospital costs. Arango did not separate out the Smith remodeling invoices, and they were charged to the hospital accounts as ordinary expenses. Checks to pay these, and all hospital expenses, together with the respective invoices,[8] were taken to Smith to sign, in accordance with appellant's practice of signing all the general account checks of the hospital, in order to keep tight control over the various expenses. At the top right corner of the checks was a "stub" portion indicating the account to which expenses were charged by number, and sometimes by name also. Smith signed checks which paid for his home remodeling, as well as those for all other hospital expenses.

The establishment of an open end loan from the hospital to Smith is argued as an explanation for the erroneous expensing of appellant's personal costs to the hospital accounts. There was apparently mention of a loan as early as Arango's confrontation of Smith with the invoices in the incident described above. The minutes of two of the Board of Trustees' meetings contained authorization for a loan to Smith. The government, however, presented evidence which showed the minutes to be unreliable.[9] The hospital had at various times made loans to hospital employees, loans which were properly reflected in the books and not charged to the general hospital accounts reported to Blue Cross. The account books of the hospital did not reflect a loan to Smith until September of 1972, by which time the auditor for Blue Cross had discovered that the remodeling costs of Smith's home had been carried on the hospital books as reimbursable expenses, and raised this issue with Arango. Two witnesses, one an accountant with PSGH who handled accounts receivable, the other an accountant who assisted an independent CPA with auditing the hospi-

6. Although determining that sufficient evidence was present for the jury to find appellant knew improper costs to be reflected in the Medicare forms with respect to *each* transaction alleged, we nevertheless note that if there had been sufficient evidence to prove *mens rea* in connection with *any* or either of the improper expenses alleged, sufficient basis would exist for affirmance of the conviction. *Crain v. United States,* 1896, 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097, 1100; *United States v. Edmondson,* 5 Cir. 1969, 410 F.2d 670, 673 n. 6, cert. denied, 396 U.S. 966, 90 S.Ct. 444, 24 L.Ed.2d 430.

7. By ordering supplies through the hospital Smith could take advantage of discounts and wholesale prices available to PSGH which he would not otherwise be able to obtain.

8. In some instances, the delivery address of invoices for goods used in the remodeling of Smith's home was "scratched" out.

9. *I. e.* Mr. Raymond Woody, a Trustee at that time, is recorded as present on February 19, 1970, the date Smith's loan was allegedly authorized to be increased, although he was not present at that meeting. Throughout the minutes of the Trustees' meetings he is recorded as present and taking part, yet he testified to having attended only two meetings, one in 1967, and one in 1973.

tal's books, both employed between the time the loan was originally said to have been made and September 1972, testified they were not aware of any loan.

 The home remodeling costs of appellant were reflected for a two and one half year period in the general hospital expenses as reported to Blue Cross. Arango's testimony that Smith told him to "segregate" the home remodeling invoices from the others, four months or so after the start of the remodeling project, in no way compelled the jury to discount the import of the other evidence. The government is not to be held accountable for the testimony of each of its witnesses. *United States v. Gordon,* 5 Cir. 1969, 410 F.2d 1121. It is not necessary that testimony be received "in a vacuum". See *Cohen v. United States,* 5 Cir. 1966, 363 F.2d 321, 327. Loans to other employees during this time period were properly identified on the PSGH books. Auditors from the Internal Revenue Service and Blue Cross were not told of the existence of any loan to Smith during this entire time period, despite extensive and almost constant audits, until after they had independently discovered the irregularity. Members of the hospital staff "in a position to know" were unaware of a loan. Forman, a CPA and the hospital's external auditor, did not know of the existence of a loan, nor did his assistants. The Board of Trustees' minutes argued by appellant to show the existence of a loan are not convincing, since they were proven to be incorrect in several particulars. Additionally, because of both his position as head of the hospital, and his family ties, the appellant was in a position to control the Board of Trustees.[10] From the evidence presented the jury had an ample basis for concluding that appellant knew full well that the remodeling expenses for his home were listed on the hospital's account books as general hospital expenses.

The second transaction relied on by the government as reflecting non-reimbursable costs, those which were not legitimate hospital expenses, but nonetheless so reported to Blue Cross, involved the inter-relationship between Smith, his nephew Gregory Robinson, and International Computer Sharing, Inc. (ICS). ICS was formed in March 1968, by Aspee Irani, a member of the PSGH Board of Trustees. In April 1968, PSGH entered into a contract with ICS to provide it with computer services. At this time Irani gave away his stock in ICS, but remained, for a salary, in a consultant status. It is doubtful that Irani ever lost control of ICS. The computers which ICS installed in the hospital were leased by it from IBM through another Irani concern, Irani and Associates, a consulting and engineering firm.[11] During the time period in question, the PSGH account constituted ninety-five percent of ICS's business.

In the fall of 1968 several events took place, of which the order was in conflict in the trial testimony. Raynes, an IBM systems engineer, testified he provided to ICS and PSGH two computer programs only recently obtained by IBM. These programs, not yet in the IBM library, and not then in use within the Miami area, suited the hospital's needs. It was at that time IBM's policy to provide these programs without charge to concerns which leased their equipment from IBM. Raynes testified that when he delivered the programs to PSGH, the hospital did not have computer programs to perform the functions of the ones he delivered.

---

**10.** The Board of Trustees of PSGH between 1968 and 1971 consisted of the appellant, Oakley Smith, his wife, Patricia Smith; his nephew, William Robinson; Raymond Woody, who attended no meetings during the years involved (although often listed as present and participating); Edward Santamaria, who resigned in September 1968, shortly before the loan is asserted to have been taken out; and lastly Aspee Irani, a person deeply involved in a second transaction to be discussed *infra.*

**11.** Still another Irani concern, Irani and Castanon, an "architectural and design" corporation, designed PSGH.

In October of 1968 ICS began paying Gregory Robinson, nineteen year old nephew of appellant, $2,600 per month for computer programs he allegedly sold to ICS, two of which performed the same functions as the ones delivered by Raynes.[12] He was paid, in all, $67,000. The payments were completed in December 1970, six months into the fiscal year 1971,[13] which ended June 30, 1971. The evidence established that the programs Raynes delivered and the ones sold by Robinson are one and the same. Irani testified that the computer programs in question were bought from Robinson three or four months before they were delivered by Raynes from IBM, and that Robinson stated he had gotten them "from a friend". Raynes' testimony thus conflicts with that of Irani both as to the time periods involved and as to the order of events.

Appellant testified Robinson had approached him in September 1968, about selling the programs, and that he had directed him to Irani of ICS. Irani testified that the person he had given the ownership of ICS to had instructed him to check out Robinson's programs, that he had, and that he found them to fulfill the hospital's needs. Irani delivered checks from ICS, made out to Robinson, to the front desk at PSGH. Smith often cashed these checks, frequently endorsing Robinson's name on them.

It was the government's contention that not all the money the hospital paid ICS, reflected on the Medicare report, was a legitimate hospital expense, because that money necessarily included the fraudulent ICS–Robinson transaction.[14] The jury had before it ample evidence supporting the correctness of this contention.

The jury heard testimony from which it could conclude that ICS was paying Robinson for programs acquired free from IBM through Raynes. Smith was shown to know of the ICS–Robinson arrangement. In fact he testified that Robinson approached him about the deal. He personally cashed Robinson's checks, so whether or not Robinson ultimately received the money, it was clear that Smith knew the amount involved and was aware of the identity of the participants. Smith knew also that in excess of 25% of the amount PSGH paid ICS for computer services eventually was reflected in the checks to Robinson. Weighing the surrounding circumstances, the money involved, the business connections and arrangements of the parties, the kinship and close financial relationship between Smith and Robinson, the direct and circumstantial evidence before the jury warranted a conclusion that Smith knew of the fraud inherent in the payments to Robinson, and therefore knew that not all the money paid ICS was a legitimate expense of the hospital as he knew it was reported to Blue Cross.

The third action by the appellant relied upon by the government as unlawfully reflected by the medicare cost reports is a home delivery diaper service received by Smith and paid for by the hospital from November 1970, through June 1971. Appellant urges that the diaper service was intended to be handled as an employee's fringe benefit. It was not charged to the fringe benefit account, however, but was paid for through the commercial linen account, a cost set forth in the Medicare total operating expenses form. No other employees had access to a diaper service as a fringe benefit. These checks, to pay for

---

12. The programs in question are an "accounts receivable" program and a "patient billing" program. There was some testimony that three programs had been sold ICS by Robinson, but neither the identity, nor the existence, of the third program was ever established.

13. $15,600 or $2,600 per month for six months, is the amount of money paid to Robinson during the hospital's fiscal year 1971, and the amount reflected in the medicare reports.

14. The trial judge instructed the jury that this was not a kick back case:

"[T]he Government's position is that Mr. Smith knew that the full amount paid to the computer service was not, in fact, for the computer service for patient care, not that Mr. Smith was getting any money out of that . . . ."

the service, were signed by appellant in the manner of all the other hospital expense checks already mentioned.

Whatever appellant's original intent, the diaper service was not handled as a fringe benefit on the hospital books. The jury possessed sufficient evidence to determine that Smith, because of his practice of signing all checks to keep tight control of hospital costs, knew that the diaper service was being charged to commercial accounts of the hospital, and that he therefore had knowledge that the Medicare reports contained false information as to the diaper service expenses.

■■ It is no defense for appellant to assert, as he does, that he relied upon the expert advice of his CPA, Forman, before he signed the Blue Cross forms in question. The reliance defense, to be effective, must establish good faith reliance on an expert coupled with full disclosure to that expert. *Bursten v. United States,* 5 Cir. 1968, 395 F.2d 976; *United States v. Cox,* 6 Cir. 1965, 348 F.2d 294; *United States v. Baldwin,* 7 Cir. 1962, 307 F.2d 577, cert. denied, 1963, 371 U.S. 947, 83 S.Ct. 501, 9 L.Ed.2d 497. The evidence as to each of these financial transactions sufficed for the jury to find Smith had knowledge that his personal expenses and those not of the hospital were included within the general hospital accounts as transcribed to the Medicare forms. Claimed negligence on the part of his CPA in failing to discover these irregularities is irrelevant. Smith's reliance could not be in good faith if he had knowledge contrary to the conclusions of his CPA. The fact that material is not intentionally hidden fails to meet the requirement that it be fully disclosed. The reliance defense serves the purpose of negating intent to commit an offense. It will not avail as a means of shifting criminal responsibility.

## II. THE INDICTMENT

■ We next consider whether the indictment under which appellant was convicted was deficient in the particulars urged by the appellant. To ensure that an indictment is legally sufficient, it must allege the essential elements of the offense so as to inform the defendant of the charges he must meet, and it must be at least specific enough that a verdict under it will protect the defendant from double jeopardy. *Russell v. United States,* 1962, 369 U.S. 749, 763, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240, 250; *United States v. Mekjian,* 5 Cir. 1975, 505 F.2d 1320, 1324.

Count Three of the indictment reads:

That on or about the 21st day of January, 1972, in the Southern District of Florida,

### OAKLEY G. SMITH,

the defendant herein, willfully and knowingly did make and cause to be made false, ficticious and fraudulent statements and representations as to material facts in a matter within the jurisdiction of the United States Department of Health, Education and Welfare, in that cost reports, Social Security Administration Forms 1563, 1562, and 1992, for the fiscal year ending June 30, 1971, were submitted to Blue Cross of Florida, an agent and fiscal intermediary of the United States Department of Health, Education and Welfare, wherein OAKLEY G. SMITH stated and represented that the expenses and costs set forth in Forms 1563, 1562, and 1992, were costs reimbursable under Title 18, Social Security Act, as amended, for the operation of Palm Springs General Hospital, Inc. of Hialeah, Florida. Whereas, in truth and fact, as he then well knew, the expenses and costs set forth in Forms 1563, 1562, and 1992, were not reimbursable costs but included purchases and expenditures which were false and fraudulently represented to be costs for the operation of Palm Springs General Hospital, Inc. of Hialeah, Florida.

All in violation of Title 18, United States Code, Section 1001.

It is not seriously urged by the appellant that the indictment is so vague that he could be in danger of further prosecution placing him in double jeopardy. The indictment alleges the elements of the offense charged.[15] Appellant's argument on this point centers in his contention that the indictment was so vague that it failed to inform him of the nature of the charges he must meet in order properly to prepare a defense. This argument will not withstand critical analysis in the light of the record. While the actual offense involved was the promulgation of the false medicare forms, as properly stated in the indictment, the substantive acts, or underlying frauds, were the improper expensing of (a) the costs of the house remodeling, (b) the ICS transaction, and (c) the diaper service, to general hospital accounts. Appellant, doing little more than articulating a conclusion, argues that the complexity of the medicare forms, together with the vagueness of the indictment, made it impossible for defendant to prepare a defense. This argument is without merit. "[T]he validity of an indictment is determined by practical, not technical considerations". *United States v. Miller,* 5 Cir. 1974, 491 F.2d 638, 649, cert. denied, 1975, 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186, citing *United States ex rel. Harris v. Illinois,* 7 Cir. 1972, 457 F.2d 191, 197, cert. denied, 1972, 409 U.S. 860, 93 S.Ct. 147, 34 L.Ed.2d 106; *United States v. Miranda,* 5 Cir. 1974, 494 F.2d 783; *Robbins v. United States,* 10 Cir. 1973, 476 F.2d 26, 30; *United States v. Missler,* 4 Cir. 1967, 414 F.2d 1293, 1297. The indictment stated the location of the false statements, and the theory under which the government would argue them to be false. More importantly, the defense sought by motion and received extensive bills of particulars which detailed the underlying fraudulent acts already discussed. This was a typical case requiring identification of the transactions relied upon to permit the defendant to prepare for trial. These particulars were supplied by the prosecution. See, in this connection, *Rosen v. United States,* 1896, 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606; *United States v. Salazar,* 2 Cir. 1973, 485 F.2d 1272, cert. denied, 1974, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882; *Hickman v. United States,* 5 Cir. 1969, 406 F.2d 414, cert. denied, 1969, 394 U.S. 960, 89 S.Ct. 1309, 22 L.Ed.2d 561; *Van Liew v. United States,* 5 Cir. 1969, 321 F.2d 664. The trial transcript demonstrates throughout that the defense was aware of the nature of the transactions relied upon to prove the offense alleged.

Appellant also argues that there was fatal variance between the allegations and the proof in this case. He argues that the supplemental bill of particulars, requested by the defense prior to trial, identifying the ICS transaction as appearing on Social Security Administration form 1562, schedule A, line 1, column 2, varied from the proof. Not so. Schedule A, line 1, column 2, is the place for showing direct expenses of the hospital, other than salary, as shown in the hospital's books. In the report filed, this amount was shown as $1,394,245. Appellant urges that even if the $1,394,245 figure is inclusive of the fraudulent transactions, it is correct because it accurately reflects the books, and the false statement would appear in a later "adjustment" column. This is specious. The figure purports to be hospital ex-

---

**15.** The elements necessary to allege a violation of Title 18, U.S.C., Section 1001 are:

(1) a false statement (see, e. g., *United States v. Kraus,* 5 Cir. 1975, 507 F.2d 113);

(2) made "knowingly and willfully" (*United States v. Mekjian,* 5 Cir. 1975, 505 F.2d 1320; *McBride v. United States,* 5 Cir. 1955, 225 F.2d 249),

(3) of a material fact (*United States v. McGough,* 5 Cir. 1975, 510 F.2d 598; *Rol-*

*land v. United States,* 5 Cir. 1953, 200 F.2d 678),

(4) relating to "matter within the jurisdiction of any department or agency of the United States." (*Bryson v. United States,* 1969, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264; *United States v. Bramblett,* 1955, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594).

The latter case contains a helpful history of the development of Section 1001.

penses. The amount falsely included is not a hospital's expense, even though shown in the hospital's books as such. In other words, the ICS transaction was incorrectly shown as expense on the hospital's books. It was therefore necessarily incorrectly represented in the total figure of $1,394,245. The figure was indeed false, as the supplemental bill of particulars asserted.

The thrust of the indictment and the bills of particulars was that "purchases and expenditures that were false and fraudulently represented to be costs for the operation of [the hospital]" were included in the Medicare forms. Appellant, because of the many figures and the complexity of the forms argues he could not know which if any of the figures was false. He does not argue in this respect that the forms were correct, just that he could not know where they were wrong. He labors here under a misapprehension. It is not necessary that Smith have known which line was incorrect when he approved the forms, nor that he be able to properly fill out the forms himself. He is not charged with a mistake, but with an intentional act. It suffices that he understood the forms necessarily to include expenses which were not those of the hospital, and that a percentage of the amount claimed would be reimbursed erroneously to the hospital from HEW. This is what the indictment and the bills of particulars alleged, and what the government proof showed.

## III. DUE PROCESS VIOLATION IN PROSECUTION UNDER SECTION 1001

 Appellant next contends that the government was required to prosecute Smith's offense under Title 42,

U.S.C. Section 408(c),[16] a misdemeanor statute rather than under the false statement statute, Title 18, U.S.C. Section 1001, for a felony. It is established in the jurisprudence of this Circuit that, in a situation of overlapping offenses, prosecution may be brought under either statute at the discretion of the prosecution. *United States v. Chakmakis*, 5 Cir. 1971, 449 F.2d 315, 316. The inter-relationship of the identical statutes here in question was considered in *Chakmakis*. A doctor had been convicted of violating Title 18, Section 1001, for filing fraudulent applications for payment under provisions of the Social Security Act. He argued on appeal that he should have been charged under the more recently enacted misdemeanor provision, Title 42, U.S.C. Section 408(c). We stated:

"[I]t is quite clear that the enactment of the later section did not repeal the former and that the facts of the alleged offense fell within the terms of either statute. Hence, the prosecution could have been brought under either, at the discretion of the prosecutor. *Bartlett v. United States*, 10 Cir., 1948, 166 F.2d 920, 926; *Hopkins v. United States*, 9 Cir., 1969, 414 F.2d 464; *Ehrlich v. United States*, 5 Cir., 1956, 238 F.2d 481, 485; *United States v. Cox*, 5 Cir., 1965, 342 F.2d 167, 171, cert. denied [sub nom.] *Cox v. Hauberg*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700." *Ibid.* at 316.

Accord, *United States v. Fournier*, 5 Cir. 1973, 483 F.2d 68; *United States v. Brown*, 9 Cir. 1973, 482 F.2d 1359, 1360. Binding precedent puts an end to this claim of error.

## IV. COMPOSITION OF THE GRAND JURY

 The grand jury which indicted appellant had been drawn from a jury wheel filled in December 1968.[17] At the

---

**16.** The Social Security Act, Title 42, U.S.C., Section 408 provides

Whoever—(c) at any time makes or causes to be made any false statement or representation of a material fact for use in determining rights to payment under this subchapter;

. . . shall be guilty of a misdemeanor
. . .

**17.** The jury plan for the Southern District of Florida, promulgated pursuant to the Jury Selection Act of 1968, Title 28, U.S.C. Section

time of the indictment of Smith, the wheel was four years four months old. Appellant argues that the young and the Cuban Americans of the Miami, Florida, area were unconstitutionally excluded from the grand jury which indicted him, requiring a reversal of his conviction. Again, binding precedent of this Circuit is to the contrary. We have recently had occasion to consider this same argument, and have found no substance in similar attacks on similarly constituted grand juries. *United States v. Gooding*, 5 Cir. 1973, 473 F.2d 425; *United States v. Hill*, 5 Cir. 1974, 500 F.2d 733. "The defendant complains that the failure to add to the master jury wheel the names of newly registered voters since 1968 or 1969 occasioned the systematic exclusion of certain 'cognizable groups,' namely young adults between the ages of 21 and 25 years and newly arrived Latin Americans. This argument falls short under previous decisions of this Court. [citations omitted]." *Hill*, supra, at 738. The *Hill* court found further support for its decision in *Hamling v. United States*, 1974, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590. There, faced with the argument that the young had been excluded from the grand jury which had indicted Hamling because of a four year period between the filling of a jury wheel and the subsequent empaneling of the indicting grand jury, the Supreme Court stated:

"[U]nless we were to require the daily refilling of the jury wheel, Congress may necessarily conclude that some periodic delay in updating the wheel is reasonable to permit the orderly administration of justice. [Citing as examples *United States v. Pentado*, 5 Cir. 1972, 463 F.2d 355, (three year delay); *United States v. Gooding*, 5 Cir. 1973, 473 F.2d 425, (three year four month delay), and *United States v. Kuhn*, 5 Cir. 1971, 441 F.2d 179, (five year delay).] Invariably of course, as time goes on, the jury wheel will be more and more out of date, especially near the end of the statutorily prescribed time period for updating the wheel. But if the jury wheel is not discriminatory when completely updated at the time of each refilling, a prohibited 'purposeful discrimination' does not arise near the end of the period simply because the young and other persons have belatedly become eligible for jury service by becoming registered voters. *Whitus v. Georgia*, 385 U.S. 545, 551, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967); see *Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)."

418 U.S. at 138, 94 S.Ct. at 2918, 41 L.Ed.2d at 632. Although *Hamling* involved solely the question of exclusion of the young, two of the three Fifth Circuit cases cited by the Court dealt not only with the young, but also with Cuban American citizens being excluded from jury service by virtue of the age of the jury wheel. See *United States v. Pentado*, 5 Cir. 1972, 463 F.2d 355, and *United States v. Gooding*, 5 Cir. 1973, 473 F.2d 425. There is here no basis for the allegation that the jury wheel was unconstitutionally constituted.

Appellant relies on *United States v. deAlba Conrado*, 5 Cir. 1973, 481 F.2d

---

1861 et seq., was for the wheel of the district to be emptied and refilled from the list of registered voters at specified five year intervals. The jury which indicted appellant was empaneled in April, 1973, four years and four months into the five year plan. The Jury Selection Act was amended in April, 1972, to provide that jury wheels must be emptied and refilled at intervals of not more than four years, and that a new wheel must be made up by Sept. 1, 1973. Provision was made, however, that:

"(b) Nothing in this Act shall affect the composition or preclude the service of any jury empaneled on or before the date on which the qualified jury wheel from which the jurors' names were drawn is refilled in compliance with the provisions of section 3 [28 U.S.C. § 1863]."

The indicting grand jury was thus empaneled according to the applicable provisions of the Jury Selection Act, and its composition was statutorily valid.

1266, in which this Court remanded for a hearing to determine if a cognizable ethnic group, Latin Americans, was systematically excluded from the challenged jury. *deAlba Conrado* is inapposite since it involved consideration of the procedures under which petit juries were selected from a jury list. The challenge was not addressed to the list, nor to the names in the wheel, but to the method by which juries were selected from it. Smith's challenge here is to the names in the wheel itself. *Hill, Gooding* and *Pentado,* supra, completely foreclose such an attack.

## V. INCONSISTENCY OF THE VERDICT

■ Appellant also argues that his acquittal on eight charges, and particularly the two prior Section 1001 counts (Counts One and Two) of the indictment is so inconsistent with his conviction on the remaining Section 1001 count, Count Three, as to require reversal. This attack is without legal foundation. No explanation is required, but if one were needed, a plausible explanation for this claimed inconsistency is that conviction under Section 1001 requires the willful communication of false information to the government, and that the jury did not impute this knowledge to Smith as to the earlier Section 1001 counts, the proof being based—as it was—on a pattern of irregular acts. Such speculation must remain academic in any event. Consistency in a verdict has never been a requirement for a conviction in courts of the United States. *Dunn v. United States,* 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356. See also, *Hamling v. United States,* 1974, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590. This rule has been often applied by our prior decisions. See, e. g., *United States v. Guajardo,* 5 Cir. 1975, 508 F.2d 1093, 1096; *United States v. Kohlmann,* 5 Cir. 1974, 491 F.2d 1250, 1253; *United States v. Cantu,* 5 Cir. 1972, 469 F.2d 679, 680.[18]

18. As to the continued viability of *Dunn,* despite some criticism of the reasoning therein of

## VI. DISCRIMINATORY PROSECUTION?

■ Finally appellant urges us to hold that he was the subject of an illegally discriminatory prosecution. We find no support in the record for this charge. The basis of appellant's prosecution was an intentional criminal act of filing a knowingly false statement. Medicare form mistakes, which, as the appellant contends, the evidence showed to be commonly made by other hospitals, are not, without more, criminal acts. Moreover, the decision of whether or not to prosecute in any given instance must be left to the discretion of the prosecutor. *Smith v. United States,* 5 Cir. 1967, 375 F.2d 243, 247, cert. denied, 1967, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106; *United States v. Cox,* 5 Cir. 1965, 342 F.2d 167, 171, cert. denied, 1965 *sub nom., Cox v. Hauberg,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700. This discretion has been curbed by the judiciary only in those instances where impermissible motives may be attributed to the prosecution, such as bad faith, race, religion, or a desire to prevent the exercise of the defendant's constitutional rights. *United States v. Berrios,* 2 Cir. 1974, 501 F.2d 1207, 1211. See, *United States v. Oaks,* 9 Cir. 1975, 508 F.2d 1403; *United States v. Swanson,* 8 Cir. 1975, 509 F.2d 1205. No such motive has been shown in this case.

## VII. CONCLUSION

We find Oakley Smith to have been properly indicted for a violation of Title 18, U.S.C. Section 1001, by a validly constituted grand jury. He received a fair trial at which sufficient evidence was presented to warrant the jury's lawfully returning its verdict · of guilty as to Count Three of the indictment. The verdicts rendered were not reversibly inconsistent. The appellant presented no evidence that he was the target of "invidious" prosecutorial discrimination. The conviction is in all respects

Affirmed.

Mr. Justice Holmes, see *United States v. Greene,* 7 Cir. 1974, 497 F.2d 1068, 1085–86.