**UNITED STATES of America, Plaintiff-Appellee,**

v.

**E. L. MARKHAM, Jr., Defendant-Appellant.**

No. 75–3839.

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1976.

Rehearing and Rehearing En Banc Denied Sept. 22, 1976.

Aubrey M. Daniel, III, C. S. Robb, Washington, D. C., John J. Fisher, Dallas, Tex., for defendant-appellant.

Frank D. McCown, U. S. Atty., Ft. Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GEWIN, GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The appellant, E. L. Markham, Jr., was convicted after jury trial under an indictment charging him in a single count with violation of Title 18, U.S.C., Section 1001. The indictment was based upon the prosecution by appellant of a patent application before the United States Patent Office, the charge being essentially that Markham attempted to conceal from the Patent Office

the true inventor of the process for which a patent was sought.

Three purported errors of the trial court are urged on appeal. Markham asserts that the court erred (1) in denying defendant's motion to dismiss the indictment as facially insufficient, (2) in denying his motion for judgment of acquittal because of insufficiency of the evidence, and (3) in prejudicially limiting the scope of defense counsel's cross-examination of certain witnesses. We find each point raised to lack merit, and accordingly affirm.

### FACTS

Viewing the evidence at trial in the light most favorable to the government, *Glasser v. United States*, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704; *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, 831, we note the following relevant facts.

In 1957 Orlando F. Klein patented a building process for construction of buildings by using corrugated asbestos panels with insulation sandwiched between them. Appellant invested in this process, and was an assignee of an interest in the patent. One house was built using this process and a second was partially completed. The project ran out of funds so that the process was never commercially exploited. Appellant and his fellow investors never received a return on their investment.

Between 1963 and 1968 Klein developed another building process he termed the "Drycore" system which differed substantially from the patented system. The new concept, simply described, called for the use of horizontally corrugated asbestos panels with insulation sandwiched between them, to be erected prior to the pouring of the slab and foundation of the building, with the asbestos panels serving as walls. Insulated heating and cooling ducts were formed, and steel reinforcing rods were set lacing through the asbestos walls throughout the area for the foundation and floors. Thus when the foundation and floor slab were poured in concrete, the walls, floor foundation, and heating and cooling ducts all became one integrated unit. The roof, constructed of the same material, was to be similarly tied to the structure by reinforcing bars and concrete, resulting in an extremely well insulated building designed to be economically and quickly built.

Between 1965 and 1969, Orlando Klein and Markham met several times to discuss the system. In 1968 Klein had an architectural firm draw up a set of house plans utilizing the Drycore program. These plans clearly identified Klein as developer of the system by means of a printed legend. Copies of the plans were distributed in 1968 to appellant and several other persons. In January, 1969, Klein and several investors to whom he had sold franchises in the Drycore system began construction of a model home in Grand Prairie, Texas, using Klein's plans. Markham was not an investor, although he was attorney for the project, which was to be incorporated. He appeared to believe that his percentage of the prior patent gave him a similar interest in the Drycore process. The Grand Prairie house took nine months to complete rather than the anticipated 21 days. The investors, the actual builders of the house, blamed their difficulties on Klein. Markham did not see the house until it was nearly complete. At that time signs around the house prominently stated that the construction technique had been developed by Klein.

Klein and his wife went to Markham's office on September 19, 1969, to sign articles of incorporation for the Drycore project. When they saw the final documents they expressed doubts and stated their desire to obtain another legal opinion before they signed. Appellant became angry and ordered the Kleins from his office, which marked the end of their attorney/client relationship. The following day Klein wrote Markham that it was important for the process to be incorporated to avoid a "deterioration" of the total concept, which he described as "entirely foreign" to the method patented in 1957.

Klein's relationship with the investors and purported franchisees rapidly deteriorated after the Grand Prairie model home was completed. Those investors realized

that they were in danger of losing their money due to Klein's inability or refusal to take any action to market or distribute his process. Klein, aside from not having yet incorporated his project, as he had promised, had misled the investors by stating that his construction process was covered "by patents granted and pending". The only existing patent was that of 1957. Klein's concept of patent pending was merely that he had placed documents with his patent lawyer in anticipation of filing an application. Klein also failed to carry out a promise to build a model home in Houston prior to a major builder's conference there in early 1970.

Several disgruntled investors, including Messrs. Roberts, Shipley, and Crowson, met with Markham in December 1969 to discuss means of protecting their investments. A decision was reached to construct a Houston demonstration home without Klein's participation, but using the plans and knowledge they had obtained from constructing the Grand Prairie home. The group planned also to sell franchises for the building method. To this end a corporation, "Dry-Therm", was formed, with Markham as president. Tentative plans were made to escrow a percentage of Dry-Therm profits for the Kleins. Shipley, Roberts, and Crowson assigned to Dry-Therm the rights Klein had sold them under franchise agreements. Markham assigned to Dry-Therm his supposed interest under the old patent. Markham also furnished the major portion of the funds required to build the Houston house. This house was built, primarily by Shipley and Roberts, very quickly in January of 1970. With the exception of minor variations and innovations, the Houston house was substantially identical to the Grand Prairie model house. Appellant and Roberts prepared an advertising brochure from the Grand Prairie plans and prior advertising material of Klein.

Klein had not filed for a patent on his building process. The investors feared they would lose their investments because one year after the completion of the Grand Prairie model home the concepts of Drycore would become prior art and a part of the public domain, and therefore unpatentable.[1] Markham arranged a meeting between Shipley, Roberts, Crowson, and his patent attorney, Howard Moore. Roberts, for one, asserted at trial that he understood that a patent application was to be filed on behalf of Klein, and that Moore had said such action was possible. Markham asked Roberts and Shipley whether they thought they had any patentable ideas. Each man suggested relatively small design modifications of the Klein process, and sketched these ideas for the benefit of the patent attorney. The patent attorney advised Markham that the Drycore process was distinct from the 1957 patented process, and that Markham's interest in the 1957 patent, and by contract in derivative patents, afforded him no rights in the Drycore system. After the meeting was concluded, Markham cautioned Crowson, Roberts, and Shipley to inform no one of what they had heard.

Moore's associate, Crutsinger, prepared a patent application for the building construction method. Drawings used to illustrate the patent application were traced by the patent lawyer from the plans used for the Grand Prairie house. Shipley and Roberts were named the joint and sole inventors of all the processes disclosed, when in fact no more than part of the peripheral ideas were arguably traceable to them. Appellant remained in contact with Crutsinger during the period of preparation of the application.

In May of 1970 the patent application was completed. Shipley signed the inventor's oath, appearing to believe that all the ideas contained therein were his and Roberts. After studying a copy of the application Roberts refused to sign the oath. Despite this refusal, Markham, as president of

1. See Title 35, U.S.C. § 102, which provides in part that:
 "A person shall be entitled to a patent unless—
 \* \* \* \* \* \*

 (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . .."

Dry-Therm, the assignee of Shipley's and Roberts' "franchise rights" obtained from Klein, signed an oath that he believed Shipley and Roberts to be the sole and original inventors of the process.[2] Meanwhile Klein received a copy of the patent application from Roberts. He immediately wrote the Patent Office complaining that his invention was improperly represented within the Dry-Therm application as that of Shipley and Roberts. In December, 1970, Markham suggested to Klein that he honor appellant's application, since Klein was without funds to file on his own behalf. Klein refused, and threatened suit against all parties involved in what he termed a "takeover".

On April 2, 1971, the Patent Office wrote Moore requesting a further showing of the reasons Roberts refused to sign the inventor's oath, and the necessity for the submission of appellant's affidavit in lieu thereof. Markham and Moore each submitted an affidavit in reply. Appellant stated that a demonstration home had been built almost a year prior to the filing of the patent application (the Grand Prairie house), and that prompt filing was therefore necessary to protect the rights of Dry-Therm, the assignee. He informed the Patent Office also that Roberts had been in contact with a "competitor", Orlando Klein, who had failed to carry out prior licensing agreements concerning the process. Appellant said that Klein had learned the contents of the patent, so that prompt action on the part of Dry-Therm in filing the application was essential. Markham did not mention Klein's relationship to the Grand Prairie house.

Subsequently, Shipley and Roberts on September 27, 1971, filed disclaimers with the Patent Office denying participation in the inventorship. Each asked that his name be withdrawn from the application. Following correspondence from the Patent Of-

fice, Moore wrote the Patent Office March 22, 1972, stating that Shipley and Roberts had entered the employ of Klein, and thus had abandoned Dry-Therm. He requested that the Patent Office return the application to the examining procedure. The Patent Office complied with this request, but first required a further affidavit from Markham stating his continuing belief that Roberts and Shipley were the true inventors of the process. No patent was issued on the Dry-Therm patent application. In late 1973 it was finally abandoned. Klein had meanwhile filed his own patent on the Drycore process. The Patent Office never issued a patent on this application.

## THE INDICTMENT

Rule 7(c) of the Federal Rules of Criminal Procedure requires that the indictment set forth a "plain, concise, and definite written statement of the essential facts constituting the offense charged". The Supreme Court has recently held:

> "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense".

*Hamling v. United States,* 1974, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620. The point in contention in this case is whether the indictment "fairly informs [the] defendant of the charge against which he must defend". *Russell v. United States,* 1962, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240; *United States v. Cruikshank,* 1876, 92 U.S. 542, 23 L.Ed. 588; *United States v. Smith,* 5 Cir. 1975, 523 F.2d 771; *United States v. Mann,* 5 Cir. 1975, 517 F.2d 259, cert. denied 1976, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97; *United States v. Mekjian,* 5 Cir. 1975, 505 F.2d 1320.

---

**2.** Rule 47(b) of the Rules of Practice in Patent Cases, 37 C.F.R. § 1.47(b) provides in part that:

> "Whenever an inventor refuses to execute an application for patent, . . . a person to whom the inventor has assigned or agreed in writing to assign the invention or who otherwise shows sufficient proprietary inter-

est in the matter justifying such action may make application for patent on behalf of and as agent for the inventor. Such application must be accompanied by proof of the pertinent facts and a showing that such action is necessary to preserve the rights of the parties . . . ."

A single count indictment, five pages in length, was filed on May 23, 1975, charging appellant with having violated Title 18, U.S.C., Section 1001, by concealing and covering up material facts relating to a patent application filed with the United States Patent Office. The appellant considers this indictment to be facially insufficient in that it did not set forth the particulars of the offense charged.

■ The validity of an indictment is determined from reading the indictment as a whole, *Dunbar v. United States,* 1895, 156 U.S. 185, 190, 15 S.Ct. 325, 327, 39 L.Ed. 390, 392, and the validity of the indictment must be determined by practical, not technical, considerations, *United States v. Crim,* 10 Cir. 1975, 527 F.2d 289. See further, *United States v. Smith, supra,* at 779; *United States v. Miller,* 5 Cir. 1974, 491 F.2d 638, 649, cert. denied 1975, 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186.

The first three paragraphs of the indictment set forth the history of Klein's building construction system and the circumstances under which the government alleged the appellant and Shipley and Roberts learned the details of the construction process, referring particularly to the Grand Prairie house. Paragraphs four through six contained the government's contentions as to the filing of the patent application, detailing the chronology of the sworn statements filed by Markham alleging Roberts and Shipley to be the inventors of the system.

Paragraphs 7, 8, and 9 subheaded "Offense Charged" (set forth in the margin)[3]

3.

II.

OFFENSE CHARGED

7. Beginning on or about June 1, 1970, and continuing thereafter until on or about October 1973, the defendant MARKHAM knowingly, wilfully, and in violation of Title 18, United States Code, Section 1001, concealed and covered up by a trick, scheme and device material facts relating to the aforesaid patent application (a matter within the jurisdiction of the Patent Office, an agency of the United States).

8. In furtherance and pursuance of such violation, the defendant knew and covered up one or more material facts as set forth more particularly as follows:

(a) Defendant knew and covered up the fact that Edris Roberts and Billy J. Shipley were not the original and first inventors of all of the improvements or subject matter described and claimed in the patent application.

(b) Defendant knew and covered up the fact that Edris Roberts and Billy J. Shipley made no inventive contribution at all to some of the improvements or subject matter described and claimed in the patent application, including that covered by one or more of the following claims: 14, 17, 22 and/or 24;

(c) Defendant knew and covered up the fact that Orlando F. Klein invented, discovered, or knew of the improvements or subject matter claimed in one or more of the claims of the patent application, and Klein did so before Edris Roberts and Billy J. Shipley;

(d) Defendant knew and covered up the fact that Edris Roberts and Billy J. Shipley had worked with Klein and learned of his invention, discovery, or knowledge or such improvements while he was instructing them in constructing the demonstration house in Grand Prairie, Texas.

9. In furtherance and pursuance of such violation, the defendant did, among other things, the following:

(a) On or about June 1, 1970, defendant caused a patent application to be filed in the Patent Office naming Roberts and Shipley as inventors, among other things, of the system Klein had taught them; and defendant did this after he had secured from Roberts and Shipley an assignment of their entire interest in the application to a corporation he controlled.

(b) On or about June 1, 1970, defendant asserted the following in a statement under oath he signed and caused to be filed with the Patent Office in regard to the aforesaid patent application:

. . . I do verily believe the said Edris Roberts to be the original, first and joint inventor with Billy J. Shipley of the improvements in BUILDING CONSTRUCTION described and claimed in the annexed specification; . . ..

By these assertions, defendant intended to convey to the Patent Office the impression that Roberts and Shipley were the original and first inventors of all of the improvements claimed in the application.

(c) On or about May 17, 1972, the defendant asserted the following in a statement under oath he signed and caused to be filed with the United States Patent Office in regard to the aforesaid patent application:

My present belief is that EDRIS ROBERTS and BILLY J. SHIPLEY are the original and joint inventors of the subject matter described and claimed in the above indicated application.

By these assertions, defendant intended to convey to the Patent Office the impression that Roberts and Shipley were the original inventors

contained the meat of the indictment. The elements of the offense were set forth in paragraph 7. Paragraph 8 listed four specific material facts one or more of which the defendant was alleged to have known and covered up. Paragraph 9 described four separate actions taken by the defendant to conceal the material facts of paragraph 8. Jurisdiction and venue were alleged in the concluding paragraph, 10.

Appellant argues that the indictment was deficient because it did not identify any ideas originated by Klein in the language of the patent application which encompassed these ideas. We reject this contention as specious. The indictment specified that the building process was developed by Klein, that Markham knew this, and that Markham knowingly and willfully misrepresented to the Patent Office that Shipley and Roberts were the true inventors. The indictment charged much more than that somewhere within the lengthy patent application there lay an unidentified idea attributable to Klein which Markham concealed from the government.

 It bears emphasis that Markham was charged under the first clause of Section 1001, the concealment section, as opposed to the more common case of a charge being brought under the second clause, or "false statement" provision. Concededly, under this indictment, Markham's assertions that Shipley and Roberts were the true inventors of the building process to be patented not only concealed the true state of affairs, but were also false statements. Concealment and falsity were bound together in the context here. This duality is reflected throughout the record. Passages from government counsel's arguments to the jury and comments throughout the trial reflect the Government's position that Markham's statements were false. This is not in any manner inconsistent with the charge that Markham concealed from the

Patent Office the true inventor of the building process. Paragraph 8 of the indictment identified the information Markham knew and covered up from the Patent Office. These allegations charged concealment within the meaning of the statute, and the proof bore out the charge. The Government position was that the patent application violated § 1001—not because it contained false information—but because it withheld and covered up information. Markham was charged with covering up the following material facts known to him: (a) that Roberts and Shipley did not invent all the improvements claimed in the application, (b) that Roberts and Shipley made no contribution to some improvements, including claims 14, 17, 22, and/or 24, (c) that Klein was the original inventor of one or more claims, and (d) that Shipley and Roberts had worked with Klein, who had instructed them in his invention. These four material facts are, to a large extent, variations on the same theme. But the indictment was not fatally deficient because it broadly alleged that "one or more" of the facts material to the application were concealed, and used the term "and/or" in paragraph 8(b) in identifying the claims. See *Henslee v. United States*, 5 Cir. 1959, 262 F.2d 750, cert. denied, 359 U.S. 984, 79 S.Ct. 942, 3 L.Ed.2d 933. Read as a whole, the indictment was sufficient to inform the defendant of the crime with which he was charged, and to enable him to prepare a defense. The test is not whether the indictment might have been drawn with greater certainty and exactitude, but rather whether it set forth the elements of the offense charged and sufficiently apprized the defendant of the charges to prepare for. *United States v. Debrow*, 1953, 346 U.S. 374, 378, 74 S.Ct. 113, 115, 98 L.Ed. 92, 96. The indictment sufficiently met the applicable standards,[4] and no error occurred when the pre-trial Motion to Dismiss it was denied.

of all the subject matter claimed in the aforesaid patent application;

 (d) During the period of time from approximately June 1, 1970, through approximately October 1973, defendant failed to inform the

Patent Office of one or more of the facts set forth in paragraph 8 of this indictment.

4. The defense sought and received a bill of particulars in the instant case.

SUFFICIENCY OF THE EVIDENCE

Our established standard for weighing sufficiency of the evidence on a motion for judgment of acquittal is that set forth in *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, 825:

" . . . the test is whether taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. (citing cases)."

See also, *United States v. Smith*, 5 Cir. 1975, 523 F.2d 771; *United States v. Amato*, 5 Cir. 1974, 495 F.2d 545; *United States v. Edwards*, 5 Cir. 1974, 488 F.2d 1154; *United States v. Fontenot*, 5 Cir. 1974, 483 F.2d 315. Appellant centers his attack upon the charge that he "knowingly and willfully" concealed and covered up by a trick, scheme, or device material facts relating to the patent application, a matter within the jurisdiction of an agency of the United States.

■ "Knowingly" as used in § 1001 requires that the defendant acted "with knowledge". *United States v. Smith, supra*; *United States v. Mekjian*, 5 Cir. 1975, 505 F.2d 1320, 1321; *McBride v. United States*, 5 Cir. 1955, 225 F.2d 249. "Willfully" means that the defendant acted "deliberately and with knowledge". *United States v. Smith, supra; United States v. Mekjian, supra; United States v. Parten*, 5 Cir. 1972, 462 F.2d 430; *McBride v. United States, supra.* This record supports the conclusion that the Government established Markham's *mens rea* with respect to the offense charged.

Initially, through the testimony of Klein, the Government portrayed a long term relationship of appellant with Klein during which time it was a permissible inference that Markham gained an understanding of the developing Drycore process. Significant incidents which persuasively further established this knowledge included: (a) Klein's giving Markham, in 1968, a copy of the plans from which the Grand Prairie house would be built, with the legend endorsed thereon that they were based upon Orlando Klein's Drycore method; (b) Markham's actual inspection tour of the Grand Prairie model home, which contained signs proclaiming that it was produced by Orlando Klein's construction process; and (c) the letter from Klein to Markham, immediately after their argument in September 1969, stating that the Drycore process was new, unique, and different from the earlier patented process.

Shipley, Roberts, and Crowson each testified to their meeting with Markham in December 1969. This was the meeting at which the disgruntled investors assigned their rights as franchisees of the Drycore system to a new corporation, Dry-Therm, of which Markham was president. The stated initial purpose of this corporation was to protect the investors from the possibility that Klein's inaction would cause them to forfeit their investment. This group built a Houston model house, from Klein's Grand Prairie plans. Roberts testified that he, appellant and possibly Shipley and Crowson prepared an advertising brochure at this time titled "Dry-therm Insulated Homes, Inc., patented, incorporating Drycore Construction System" from the Grand Prairie plans and a booklet prepared by Klein to advertise the Drycore process. The formation of the Dry-Therm corporation and the construction of the Houston model house, and the attendant circumstances, were sufficient basis for the jury to reasonably conclude that Markham was not only familiar with the Drycore system itself, but knew that Shipley and Roberts had obtained the knowledge they possessed from their association with Klein.

The implications from the meeting of Markham, Roberts, Shipley and Crowson with Markham's patent attorney, Moore, were a sound basis for attributing to Markham full knowledge that the heart of the new building system he attempted to patent was based on Klein's ideas. We view it as significant that Moore advised Markham that the 1957 patent afforded him no rights under the new system, thus distinguishing the processes. This was followed by Mark-

ham's warning to the others present not to disclose what they had learned.

Markham's initial affidavit to the Patent Office, stating under oath his belief that Shipley and Roberts were the sole inventors of the process described, becomes damning in the light of this circumstance. His second affidavit, complying with the Patent Office's request for a further showing of the necessity for Markham's affidavit in lieu of the inventors' oath from Roberts, stated that a demonstration home had been built in Grand Prairie using the method to be patented. This inextricably tied the patent application to Klein's process and its product. While not mentioning Klein's connection with the Grand Prairie house, Markham in this affidavit termed Klein a competitor and suggested that Roberts might have leaked information of Dry-Therm's process to Klein. This evidence established the *mens rea* of appellant sufficiently to persuade a reasonably-minded jury beyond a reasonable doubt. Even after being advised by the Patent Office of Shipley's and Roberts' disclaimers of inventorship, Markham submitted an additional affidavit asserting Shipley and Roberts to be the inventors.

The jury below acted upon abundantly sufficient evidence in finding Markham guilty.

His counsel argues that Markham was not a patent attorney, and relied totally and in good faith upon Moore and Crutsinger to prepare the application from the information furnished by Shipley and Roberts. Acceptance of this defense would ignore the evidence and its implications and reasonable inferences. The two-pronged test of an effective reliance defense are good faith reliance of the defendant upon an expert after full disclosure of relevant facts to that expert. *United States v. Smith, supra; Bursten v. United States*, 5 Cir. 1968, 395 F.2d 976; *United States v. Cox*, 6 Cir. 1965, 348 F.2d 294; *United States v. Baldwin*, 7 Cir. 1962, 307 F.2d 577, cert. denied 1963, 371 U.S. 947, 83 S.Ct. 501, 9 L.Ed.2d 497. Markham withheld from his patent attorneys any disclosure of Klein's participation in the process to be patented except for discussions of Klein's earlier patent and allegations that Klein was a "competitor". Markham permitted his patent attorneys to proceed in ignorance of the facts to make representations which he well knew were both incomplete and untrue.

## THE CROSS–EXAMINATION OF KLEIN AND CRUTSINGER

We proceed to examine appellant's final contention that the district court erred in limiting his counsel's cross-examination of Klein and Crutsinger.

During the direct examination of Klein, government counsel inquired: "Mr. Klein, let me ask you this. Did you write voluminous letters to about every agency in Washington trying to get some relief from this situation?" Klein answered, "[y]es, I did". The defense later proffered these letters in their entirety as a basis for cross-examination of Klein as to his bias and as showing Markham's lack of criminal intent by demonstrating the adversary nature of the proceedings before the Patent Office. Appellant also urges that the letters were relevant to show that the Patent Office was aware of the dispute concerning the true inventor of the building process, and, at a later date, of the conflicting patent applications. This is evidence, argues appellant, demonstrating that there was no disposition on the part of the Patent Office to rely on the information in the Dry-Therm patent application and accompanying affidavits, and negating the materiality of the information withheld from the Patent Office by Markham. It was important to Markham's defense, it is asserted, that these matters be fully explored on cross-examination.

Markham's counsel also tried to cross-examine Klein in regard to a complaint about Markham he had filed with the Texas Bar Association Grievance Committee. That Committee had determined that the proper place for Klein's charges was in civil court, not within the grievance process established by the bar. Both of these items, the letters and the evidence relating to Klein's charges filed with the grievance committee, were

presented to the court in the form of a proffer of evidence. Counsel for the government and for the defense each argued their position regarding the evidence before the court. The court ruled:

"I deny the Defendant's proffer of evidence. As I have heretofore stated, you can ask Mr. Klein what people he wrote to in regard to Mr. Markham, but we are not going into the details of those letters or the appearance before the grievance committee or anything else".

The court subsequently modified its position and ruled that it would permit Klein to be questioned about the bringing of grievance proceedings against Markham, but not as to the disposition of the matter by the Grievance Committee, or the proceedings before the committee.

■ The scope of cross-examination is a matter within the trial court's sound discretion. Error will be found only upon a showing of abuse of that discretion. See, *Smith v. Illinois*, 1968, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956; *United States v. Beasley*, 5 Cir. 1975, 519 F.2d 233; *United States v. James*, 5 Cir. 1975, 510 F.2d 546.

■ No abuse of the trial court's discretion in this regard is demonstrated. The many letters the defense offered in evidence, written by Klein to various government officials and agencies including among others the Justice Department and the Patent Office, bore in no way upon the issue of Markham's intent, and were without relevance to that issue. The appellant was not a party to any of the correspondence. Klein's bias against Markham was already fully established: the existing enmity between Klein and Markham was apparent from Klein's testimony. The court's supplemental ruling expanded the field of questioning still further, to the outer limits of permissible inquiry.

■ Appellant's argument that the letters were somehow relevant to show that the Patent Office was fully informed of the disputed inventorship of the building process covered within Dry-Therm's patent application, thereby tending to negate the materiality of Markham's concealment of the true inventor of the building process, is falsely premised. Appellant appears to be under the impression that the government agency involved must be actually deceived to establish a violation of § 1001. This is a misconception. The charge of materiality requires only that the fraud in question have a natural tendency to influence, or be capable of affecting or influencing, a governmental function. The alleged concealment or misrepresentation need not have influenced the actions of the Government agency, and the Government agents need not have been actually deceived. *See United States v. McGough*, 5 Cir. 1975, 510 F.2d 598; *United States v. Cole*, 9 Cir. 1972, 469 F.2d 640; *United States v. Jones*, 8 Cir. 1972, 464 F.2d 1118, cert. denied, 409 U.S. 1111, 93 S.Ct. 920, 34 L.Ed.2d 692.

The proceedings before the Dallas Grievance Committee were relevant only to the issue of Klein's bias against Markham. This was shown by the filing of the proceedings, which was admitted under the supplementary ruling. The results of such proceedings are irrelevant to the criminal charges against Markham below, since the Dallas Bar of course could not exonerate him of those charges.

Also raised by appellant is claimed error in sustaining a Government objection to defense counsel's cross-examination of Crutsinger, Moore's associate, who actually drafted the patent application for Markham and Dry-Therm. Appellant's counsel asked this witness:

"The question is this: Did you in any of those conferences with Mr. Markham and in your discussions advising him with respect to the filing of these affidavits find any evidence that he intended to, by trick, scheme or device, to withhold information from the Patent Office?" (Trial Transcript, p. 380)

The court sustained the prosecutor's objection to the question as calling for a conclusion on the part of the witness. Appellant directed the trial court's attention to Rule 704 of the new Federal Rules of Evidence,

and he relies upon the Rule here, in support of his contentions of error. Rule 704 provides:[5]

> "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact".

Decision of whether the Rules applied to the trial of these proceedings, Note 5, *supra*, and whether Rule 704 supports the right to put the quoted question, need not detain us. That question was no more than a rephrasing of questions already put by defense counsel to the witness, and answered by him without objection. Crutsinger was asked (Trial Transcript, p. 379) these questions and gave these answers:

> "Q. (By Mr. Daniel, defendant's counsel) Now, you had a conference with Mr. Markham throughout the course of the preparation of this patent application, didn't you?
>
> A. Yes.
>
> Q. Was there anything he said in any of those conferences with you that gave you any indication that he thought that he was preparing and signing a false patent application?
>
> Q. No."

Regardless of the defense's right *vel non* to seek an answer to the question objected to, it can scarcely be urged that counsel had a right to put repetitious questions to the witness, or that the refusal to permit repetitive questioning of the witness was erroneous. The reach and thrust of the questions was identical. No abuse of discretion occurred when the trial court refused to permit further examination on the subject.

Error is not made out as to the trial court's restrictions on the cross-examination of Klein and Crutsinger.

The judgment below was right. It is AFFIRMED.

---

**5.** These proceedings were instituted by the May 23, 1975 indictment. No question was raised by the parties here or below as to the Rules of Evidence being in effect when the case was tried in early September, 1975. Public Law 93–595, § 1, January 2, 1975, 88 Stat. 1926, which adopted the Rules of Evidence provided in part: "That the following rules shall take effect on the one hundred and eightieth day beginning after the date of the enactment of this Act [Jan. 2, 1975]. These rules apply to actions, cases, and proceedings brought *after* the rules take effect. These rules *also apply to future procedure in actions, cases, and proceedings then pending*, except to the extent that application of the rules would not be feasible, or would work injustice, in which event former evidentiary principles apply." (Emphasis supplied).

Without the matter being argued, our offhand view is that the last sentence quoted supra, from P.L. 93–595, § 1, rendered the Rules applicable to the trial of this action.