**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0823n.06

**No. 11-5838**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Aug 01, 2012***

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | On Appeal from the United States |
| v. | ) | District Court for the Western |
| | ) | District of Kentucky |
| CURTIS GORDON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:    BATCHELDER, Chief Circuit Judge, GRIFFIN, Circuit Judge, and COHN, Senior District Judge.*

**AVERN COHN, Senior District Judge.**

## I.  Introduction

This is a criminal case involving tax and bank fraud.  Defendant-Appellant Curtis Gordon, Jr. ("Gordon") was tried and convicted by jury of eight (8) criminal counts: Counts I, II, and III, filing false personal tax returns in 2003, 2004, and 2005 in violation of 26 U.S.C. § 7206(1); Counts IV, VII, and VIII, failing to file tax returns for 2006, 2007, and 2008 in violation of 26 U.S.C. § 7203; Count V, violation of 18 U.S.C. § 1001 for falsifying an Internal Revenue Service (IRS) lien-subordination certificate during the closing of a mortgage loan; and Count VI, violation of 18 U.S.C. § 1344, executing a scheme to defraud U.S. Bank National Association ("USBank") in

---

*The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

procuring a loan. The district court sentenced Gordon to a custodial term of thirty-nine (39) months.

Gordon asks this Court to reverse his convictions on Counts V and VI and to order a new trial on the remaining counts. For the reasons that follow, Gordon's conviction is **AFFIRMED** on all counts.

## II. Background

Gordon worked as a police officer for the city of Shively, Kentucky. Additionally, Gordon owned a business called Commonwealth Security Inc.[1] ("Commonwealth"), which employed guards and off-duty police officers. Gordon first came to the attention of the IRS in 2003 for failing to withhold taxes from Commonwealth employees' pay. The IRS filed a tax lien against Gordon for $31,832.97.

For 2003 and 2004, the only income Gordon reported on his personal income tax returns was from his position as a police officer: $23,880 in 2003 and $16,094 in 2004. Gordon did not report any income from Commonwealth from 1997-2007. In 2007, Gordon filed a "corrected return" for 2005 that showed $32,294 in wages from the police department and $97,285 in income from Commonwealth.

Gordon lived on Stone Wynde Dr. ("Stone Dr.") in a house valued at approximately $280,000. In 2004, Gordon and his wife moved to a house on Beachland Beach Road ("Beach Rd."), located on the Ohio River. Gordon rented the property for $7,250 per month. The value of the house at the time was $1,500,000. Around the same time, Gordon transferred ownership of the Stone Dr.

---

[1] The record indicates that the name of the company changed several times; for the sake of simplicity, it will be referred to as Commonwealth.

house to a family member, Jerry Williams.  Payments on the mortgage, however, came out of Commonwealth's accounts.  Gordon wanted to purchase the Beach Rd. house and employed a real estate agent to assist with securing financing for the purchase.  In the summer of 2005, Gordon entered a preliminary agreement with USBank for financing of $1,200,000.  To verify his income, USBank requested Gordon's personal tax returns, tax returns of the security business, and statements showing cash on hand/liquid assets.

In response to USBank's request, Gordon produced a personal tax return for 2002 that showed a gross income of $205,789, including a W-2 from Commonwealth Security showing earnings of $136,000.  Gordon provided the 2002 corporate tax return for Commonwealth that showed gross earnings of $1,256,000.  Next, Gordon submitted a 2003 personal income tax return claiming $175,131 in income and a corporate return showing income of $1,476,000.  Finally, Gordon submitted tax returns to USBank for 2004 that showed a personal income of $196,094 and corporate income of $1,656,000.  The facts stated above are summarized in graphic form as follows:

|  | Income Reported to IRS | Personal Income Reported to USBank | Corporate Earnings Reported to USBank |
|---|---|---|---|
| 2002 |  | $205,789 | $1,256,000 |
| 2003 | $23,880 | $175,131 | $1,476,000 |
| 2004 | $16,094 | $196,094 | $1,656,250 |

3

For verification of his present income and assets, Gordon produced pay stubs reflecting a weekly salary from Commonwealth of $5,292 and bank statements with balances of $43,500 and $179,485. The actual balances of the bank accounts were $100 and $56.86.

During the loan processing, Gordon's outstanding IRS lien came to the attention of USBank. USBank asked Gordon to request the IRS to certify that its lien would be subordinate to USBank's mortgage. When a lender funds a "purchase money" mortgage, however, a federal tax lien is automatically subordinate. Nevertheless, USBank insisted, and Gordon contacted the IRS to secure such a certification. The application for lien subordination required a description of the property, a copy of the lien, a list of encumbrances, and an estimate of the property's fair-market value. Additionally, the form required Gordon to certify under the penalty of perjury that the information included was accurate and complete to the best of his knowledge.

Gordon's application to the IRS indicated that he sought refinancing on the Stone Dr. house, not that he was attempting to purchase the Beach Rd. house. Gordon sent the IRS documents purporting to be a lease/purchase agreement for the Stone Dr. house with Gordon listed as the buyer. After reviewing the documents, the IRS told Gordon that it did not appear subordination was necessary, and if it was, there was not sufficient documentation to process the request. The IRS asked Gordon to provide a copy of the lease/purchase agreement, the balance due under the agreement, an appraisal of the property, the county valuation of the property, a title report, the amount of the mortgage, and an estimated settlement statement as to how the proceeds of the loan would be distributed.

Gordon submitted the required documentation. The IRS approved the subordination to a mortgage for $266,000 on the Stone Dr. house. Accordingly, the IRS sent Gordon a "copy" of the 669-D form (lien subordination). The original certificate issued only after the IRS received confirmation of the final settlement and the new mortgage. In the interim, Gordon altered the copy to appear as if the IRS issued an approval of subordination for the Beach Dr. house for a purchase price of $1,500,000. Gordon transmitted the altered document to the closing attorney. After the closing, the attorney submitted the documents to the IRS, and the documents were routed to the same agent who approved the lien subordination application. Ordinarily, after verification of closing, the IRS would issue the certification of lien subordination, but the agent recognized the inconsistency between the 669-D form she approved and the 699-D form Gordon submitted at closing. Accordingly, the IRS opened an investigation. The IRS issued a summons for the records Gordon submitted to USBank during his application for the loan. A review of income tax returns from previous years revealed the inconsistency between the tax returns Gordon submitted to USBank and those submitted to the IRS.

Gordon proceeded to file amended returns for 2002, 2003, 2004, and an untimely return for 2005. The amended returns reflected income earned from Commonwealth using a "cost of living" analysis, presumably because Commonwealth's records were in disarray. By summer 2006, the criminal investigative unit for the IRS took over the investigation. Simultaneously, Gordon was the subject of an investigation by the Louisville Metro Police Department related to Commonwealth's billing of security services to the Louisville Metro Housing Authority ("LMHA"). Louisville police

5

executed search warrants for Gordon's house and business. The police seized documents, records, and computers.

In 2007, Gordon sold Commonwealth to an employee, Jeffrey Manning, who changed the name to United Protection. Gordon remained involved in operations, however, and the company paid his personal expenses in 2007 and 2008. Nevertheless, Gordon did not file tax returns for 2006, 2007, 2008, or 2009. Gordon says he was unable to access his financial records because his bank refused to release information to him. Thus, he argued to the jury, that he could not file returns.

### III. Jurisdiction

The district court exercised jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C.§ 1291.

### IV. Issues on Appeal

Gordon raises nine (9) issues on appeal as follows:

(1) Whether the district court erred in denying Gordon's motion to suppress evidence without holding a *Franks* hearing.

(2) Whether Gordon's statements to the IRS while applying for a loan subordination certificate were material within the meaning of 18 U.S.C. § 1001.

(3) Whether there was legally sufficient evidence to sustain a conviction of bank fraud under 18 U.S.C. § 1344.

(4) Whether the district court erred by excluding an affidavit of Gordon's late accountant, Thomas Benecke ("Benecke").

6

(5) Whether the district court should have contemporaneously admonished the jury regarding the purpose of 404(b) evidence.

(6) Whether the district court erred by excluding certain defense witnesses.

(7) Whether the district court erred in refusing to grant an evidentiary hearing or new trial based on prosecutorial misconduct.

(8) Whether the district court erred by declining to investigate/grant a new trial based on juror misconduct.

(9) Whether the district court erred in denying Gordon additional time to prepare for sentencing.

The nine issues fall into five (5) categories: failure to suppress evidence, evidentiary errors, sufficiency of the evidence, motion for a new trial, and lack of opportunity to prepare for sentencing. Each category will be separately discussed below.

## V.  Standard of Review

On motions to suppress evidence, the Court reviews findings of fact for clear error and questions of law *de novo*.  *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007).  The Court reviews evidentiary errors for abuse of discretion.  *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999).  The Court reviews challenges to sufficiency of the evidence *de novo*.  *United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005).   The Court reviews a denial of a motion for a new trial for abuse of discretion.  *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982).  This Court reviews issues not preserved for appeal for plain error.  FED. R. CRIM. P. 52(b).

## VI.  Discussion

7

### A. Motion to Suppress/*Franks* Hearing

Gordon argues the district court erred by denying his motion to suppress evidence without holding a *Franks*[2] hearing. At trial, the Government introduced evidence seized by the Louisville police in the execution of a search warrant for Gordon's house and business in 2006 after investigating Commonwealth's billing practices. The seized financial records, documents, and hard drives were later released to the IRS. Under Commonwealth's agreement with the LMHA, off-duty police officers working as security guards commanded a higher rate than civilian security guards. Louisville police suspected that Gordon improperly billed the LMHA for hours worked by civilians at the higher rate.

Gordon asserts that the officer who applied for the warrant made a knowingly false statement in the warrant's affidavit.[3] Specifically, the officer referenced the "contract" between Commonwealth and the LMHA when no such written instrument existed. This argument is without merit. The standard of review for the sufficiency of an affidavit "is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991). The district court issued a comprehensive memorandum and order detailing its reasons for denying Gordon's motion. We agree with those reasons.

---

[2]A Franks hearing refers to *Franks v. Delaware*, 438 U.S. 154 (1978), which established the right to challenge the veracity of statements in a warrant's affidavit.

[3]In the district court, Gordon argued the warrant was defective for lack of particularity and the officers impermissibly exceeded the proper scope of the search. On appeal, Gordon limits his argument to the district court's denial of a *Franks* hearing.

First, the affidavit describes information gathered from interviews with multiple Commonwealth employees who reported first-hand knowledge of forgery and fraud. The officer related the steps he took to investigate and verify the allegations. Probable cause did not turn on the existence of a written contract. Whether Gordon and the LMHA memorialized their agreement in writing is irrelevant. Moreover, the only place the words "contract" or "contractual" appear in the search warrant or affidavit is in the list of items to be seized. Accordingly, the magistrate had more than a substantial basis for finding probable cause. Gordon's argument lacked merit in the district court, as it does now.

## B. Evidentiary Errors

Gordon argues that the cumulative effect of the errors made by the district court warrant a new trial. As stated above, we review a district court's evidentiary rulings for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 140 (1997). Abuse of discretion occurs when the trial court made an error of law or a clearly erroneous finding of fact, and we will find that such error exists regarding an evidentiary decision "only where we are left with a definite and firm conviction that the district court committed a clear error of judgment." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011) (internal quotations marks, alteration, and citation omitted).

### 1. Affidavit of Thomas Benecke

During trial, Gordon moved to admit an affidavit from his deceased accountant, Thomas Benecke ("Benecke"). The district court excluded the affidavit as hearsay. In the affidavit, Benecke explained that he prepared Gordon's personal income tax returns for 2002, 2003, and 2004. Income from the security business was not included because, according to the affidavit, Benecke planned to

amend the returns after he "determined the answers to several accounting questions." Gordon contends Benecke signed the affidavit in the presence of two witnesses, one of whom was a notary public. The Government, however, counters that Gordon never produced a dated or notarized copy of the affidavit.

Gordon argues that the exclusion of the affidavit prejudiced his defense because it spoke directly to his "willfulness" in violating the tax laws. Gordon argues that the affidavit was admissible under the residual exception to the hearsay rule, FED. R. EVID. 807, because the affidavit bore circumstantial guarantees of reliability. Gordon asserts the affidavit is reliable because Benecke executed the sworn statement before two witnesses, the statement was against Benecke's civil interests, and Benecke was in poor health and knew his death was imminent. Finally, Gordon argues that because the district court admitted letters from Benecke to Gordon it was an error to exclude the affidavit.

In opposition, the Government argues that the affidavit lacked significant indicia of reliability because Gordon never produced a notarized copy. Further, Benecke died fifteen (15) months after he gave the statement, a time period that does not suggest he believed his death was imminent such that would create a circumstantial guarantee of trustworthiness similar to a "dying declaration." Lastly, the Government says that Benecke gave a statement to a federal agent completely inconsistent with that affidavit.

The residual exception to the rule against hearsay, FED. R. EVID. 807, provides that hearsay evidence is admissible when:

10

(1) the statement has equivalent circumstantial guarantees of trustworthiness [as the exceptions listed in FED. R. EVID. 803 & 804];

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

The district court did not abuse its discretion by refusing to admit the affidavit into evidence. Gordon's assertion that the affidavit contained circumstantial guarantees of trustworthiness has no merit. First, Gordon failed to produce at trial a dated and notarized copy of the affidavit. Second, Benecke's knowledge of his impending death does not provide a circumstantial guarantee of trustworthiness, similar to a dying declaration. Although Benecke had serious health problems, the affidavit was not written on his deathbed. Benecke's statement was not made in the face of imminent death, nor did it relate to the cause or circumstances of his demise. FED. R. EVID. 804(a)(1)-(5).

Further, Gordon's whole argument regarding the letters is patently misleading. Gordon correctly notes that the district court admitted several personal letters by Benecke into evidence, which the United States was able to us with devastating effect against Gordon's case. He then disingenuously argues that, if unsworn personal letters by Benecke could be used *against* his defense, the district court should certainly have allowed in a sworn, notarized, Benecke affidavit to *support* the defense. But this argument is completely mendacious; it was Gordon-not the United States-who introduced Benecke's letters. Indeed, the letters were devastating only because the United States

11

made the strategic decision *not* to oppose their introduction-and instead had Benecke's widow testify that Benecke's signature at the end of each letter was a forgery and that one of the letterheads put Benecke in an office that he did not open until a year after the date of the letter.

Moreover, documents created in anticipation of litigation are presumptively less trustworthy than ordinary business records. *Palmer v. Hoffman*, 318 U.S. 109, 111 (1943). As such, Benecke's affidavit does not meet the criteria listed in FED. R. EVID. 807. Thus, the district court did not abuse its discretion by denying admission of the affidavit into evidence.

## 2. Uncharged Conduct

At trial, the Government offered evidence that Gordon failed to file accurate tax returns in years beyond the scope of the criminal charges. The district court admitted this evidence under FED. R. EVID. 404(b). Gordon argues that the district court made two errors: (1) that the district court erred by failing to weigh the prejudicial effect against the probative value of the evidence; and (2) that the district court should have given the jury a contemporaneous limiting instruction. The standard of review in this Circuit for Rule 404(b) evidence is currently unclear, as some recent reported cases analyze 404(b) evidence one way while others do so a conflicting way. *See United States v. Clay*, 667 F.3d 689, 703 (6th Cir. 2012) (Kethledge, J., dissenting) (explaining the conflict in Sixth Circuit authority). But the conflict is irrelevant here because both approaches review the balancing-test element for abuse of discretion, *id.*, and the conflict does not address whether a district court must give a contemporaneous instruction when admitting 404(b) evidence. Indeed, it has been clear for decades that the timing of a Rule 404(b) jury instruction is "within the trial judge's discretion," see *United States v. Chance*, 306 F.3d 356, 388 (6th Cir. 2002) (relying on *United States*

12

*v. Dabish*, 708 F.2d 240, 243 (6th Cir. 1983)), meaning our review is confined to determining whether the district court abused that discretion.

The Government asserts several reasons why Gordon's arguments fail. First, the Government says that the evidence of false tax returns uncharged by the Government was not 404(b) evidence because it was a part of a continuing and connected pattern of illegal activity. Second, Gordon failed to request a balancing test from the judge and therefore waived the issue. Finally, the Government asserts that the district court's admonition during its final instructions adequately complied with FED. R. EVID. 105.

Gordon argues his previous false returns did not qualify as one of the exceptions outlined in FED. R. EVID. 404(b). "Under this rule, evidence of criminal character or propensity is excluded because the jury might convict the defendant for the conduct proving propensity rather than for the offense for which he is on trial." *United States v. Acosta-Cazares*, 878 F.2d 945, 948 (6th Cir. 1998) (internal citation omitted), abrogated on other grounds as recognized by *Rattigan v. United States*, 151 F.3d 551 (6th Cir. 1998). However, 404(b) permits evidence of prior crimes or wrongs to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Gordon's defense at trial was that he did not know he was required to report income from Commonwealth and/or he erroneously relied on the advice of his accountant. This defense put Gordon's knowledge and intent squarely at issue.

13

The Government offered evidence that Gordon under-reported his income in the years preceding 2003 and did so against the advice of an accountant.[4] Evidence that an accountant told him he must report Commonwealth income contradicted his defense of mistake. Further, that Gordon previously under-reported his income undermined his contention that he relied on Benecke's representations and/or Benecke committed malpractice. The Government introduced 404(b) evidence to counter Gordon's defense of mistake and lack of knowledge.

Before admitting 404(b) evidence, the district court must weigh the probative value of the evidence against its potential prejudicial effect. *United States v. Huddleston*, 811 F.2d 974, 976 (6th Cir. 1987), *aff'd*, 485 U.S. 681 (1988). Gordon contends that the district court failed to perform the balancing step on the record, and that failure to do so qualifies as reversible error. Failing to perform the balancing step on the record, however, will only constitute error when the defendant requests such an on-the-record finding. *Acosta-Cazares*, 878 F.2d at 950. Additionally, this Court will not disturb the district court's ruling if the record indicates that the evidence was properly admissible. *Id*. at 950-51.

The record amply supports the district court's ruling. Gordon's defense rested on the theory of mistake, inadvertence, lack of willful conduct, and reliance on a tax professional. Evidence that undermined this defense was more probative than prejudicial. This Court's case law supports that conclusion. In *United States v. Popenas*, 780 F.2d 545, 548 (6th Cir. 1985), this Court held that

---

[4]The 1999 tax return prepared by Joseph Williams, a tax professional and bookkeeper who worked for Gordon, included income from Commonwealth; however, Gordon filed a return limited to his income from the Shively Police Department. Williams also cautioned Gordon that paying personal expenses out of company accounts was improper.

14

admission of previous tax returns under 404(b) was proper to show a pattern of under-reporting from which the jury might properly infer willfulness, despite the potential of prejudice. Thus, the district court did not abuse its discretion by admitting the 404(b) evidence.[5]

Next, Gordon asserts the district court erred when it refused to give a contemporaneous admonition to the jury on the purpose and limits of 404(b) evidence in conformance with FED. R. EVID. 105. Rule 105 provides that when the court admits evidence for a limited purpose it must, on timely request, "restrict the evidence to its proper scope and instruct the jury accordingly." The district court issued an admonishment to the jury during its final instructions, but declined Gordon's request for a contemporaneous admonishment. This Circuit has specifically rejected a temporal requirement of a limiting instruction. *United States v. Fraser*, 448 F.3d 833, 839 n.4 (6th Cir. 2006); *see also United States v. Miller*, 115 F.3d 361, 366 (6th Cir.1997). As such, the district court did not err in waiting to admonish the jury until its final instructions.

### 3. Agent Stansfield/Hearsay

Gordon argued at trial and during the hearing on the motion for new trial that the district court improperly admitted hearsay by Agent Stansfield and failed to admonish the jury. The controversy surrounds the labels on several boxes of documents. Several of the boxes were marked "LMPD" or "search warrant" which Gordon believed indicated they were products of the 2006 search and seizure executed by the LMPD. Gordon argues the boxes account for two significant errors. First, the Government withheld the documents during discovery. Second, the records would

---

[5]Moreover, Gordon failed to preserve this issue for appeal when he did not ask the district court to perform an on-the-record balancing test. *See United States v. Cowart*, 90 F.3d 154, 157 (6th Cir. 1996).

15

have allowed him to refute the Government's statement during closing arguments that Gordon had not paid taxes in a decade and to accurately calculate his tax liability for purposes of sentencing. Gordon argues that this evidence was central to his defense and the admission of hearsay merits a new trial.

Stansfield testified that he wrote "LMPD" or "search warrant" on the boxes in error. Stansfield explained that his predecessor, Agent Mynatt, passed some of the documents related to the case on to him and he (Stansfie incorrectly assumed the documents were a product of the search warrant. Stansfield testified that he received only a small number of documents from the Louisville Metropolitan Police Department and the documents incorrectly labeled "LMPD" were actually produced by Gordon pursuant to a subpoena for Commonwealth records.

Gordon characterizes Stanfield's statement about getting documents from Mynatt as impermissible hearsay. Stansfield, however, never testified as to what Mynatt said. Stansfield's testimony was his first-hand account.[6] There was nothing improper about Stansfield's testimony related to the boxes.

### 4. Excluded Witnesses

### a. IRS Employees

Gordon attempted to call four (4) IRS employees from whom he sought to elicit testimony as to what representations to the IRS, or lack thereof, would be material. The district court excluded the witnesses and/or restricted their testimony on two grounds: First, that Gordon failed to comply

---

[6]Stansfield said that Mynatt procured some of the documents from a subpoena to LMHA. While this statement was not based on personal knowledge, Gordon did not object on this ground, and in any event, the record demonstrates that this was invited error.

with the disclosure requirements of FED. R. CRIM. P. 16(b)(1)(c);[7] second, that it was the role of the jury to apply the law to the facts and decide whether the statements were material. We review a district court's evidentiary rulings for abuse of discretion. *Gen. Elec. Co.*, 522 U.S. at 141. The testimony elicited from the IRS witnesses would have fallen into two categories, both properly excluded. To the extent that Gordon essentially sought to introduce legal conclusions about materiality in the guise of expert testimony, that testimony was properly excluded. "Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998). "Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses."[8] *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984).

Second, to the extent that Gordon sought to elicit testimony as to whether the IRS would have issued a lien subordination certificate for Beach Rd., that testimony is not probative of whether Gordon's statements were material.[9] Thus, the district court did not abuse its discretion in excluding the IRS witnesses. We do not reach the district court's other ground for excluding the evidence.

### b. Handwriting Expert

---

[7]Gordon argues for the first time in his reply brief that even if he did not comply with FED. R. CRIM. P. 16(b)(1)(c), the district court should have allowed the testimony. He cites to *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007) for the proposition that exclusion of a witness based only on failure to comply with discovery requirements can violate a defendant's right to present a complete defense. We do not take up this argument. *See United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001).

[8]Gordon did not attempt to qualify the IRS employees as experts.

[9]See VI.C.1., *infra,* for an analysis on the legal definition of materiality.

During his case-in-chief, Gordon introduced letters purportedly written by his deceased accountant, Thomas Benecke ("Benecke"). Gordon offered the letters to support his contention that he relied on Benecke's advice to his detriment. The Government did not object to the admission of the letters. Instead, the Government called Benecke's widow, Anna Benecke, as a rebuttal witness. Anna Benecke testified that several of the signatures on the letters did not belong to her husband. Moreover, at least one of the letters listed Benecke's business address incorrectly. During 2004, Benecke moved offices; however, a letter dated March 8, 2003 bore the address of his new office more than one year before he moved. The same letter stated that Benecke was unable to complete Gordon's accounting because of a hospital stay and illness. Anna Benecke denied that her husband had a hospital stay during this period.

A lay witness may testify as to the authenticity of handwriting "based on a familiarity with it that was not acquired for the current litigation." FED. R. EVID. 901(b)(2). Gordon sought to rebut Anna Benecke's rebuttal testimony with the opinion of a handwriting expert. Gordon made this request at trial and in his motion for new trial. The Government was prepared to call a handwriting expert to support Anna Benecke's testimony that the signatures did not belong to her late husband. Gordon did not have a handwriting expert on hand nor were the documents evaluated prior to trial by such an expert. The district court did not allow either expert to testify. Gordon securing expert review of the documents would have significantly delayed the trial. Further, Gordon submitted the letters, not the Government. More importantly, Gordon *agreed* not to call an expert if the Government agreed not to call its expert but to simply rely on Anna's testimony.

At the hearing on Gordon's motion for new trial, Gordon attempted to introduce testimony from a police officer who he represented to the district court was a handwriting expert. Analysis from a handwriting expert did not constitute newly discovered evidence; it was an attempt to relitigate an issued decided against him at trial. The district court did not err in handling Gordon's handwriting expert request.

### C. Sufficiency of the Evidence

At the close of the Government's proofs Gordon moved the district court for a judgment of acquittal as to Counts V and VI. The district court denied the motion. On appeal, Gordon argues that the Government failed to advance sufficient evidence to sustain a conviction for material misstatement or bank fraud. "The relevant question in determining the sufficiency of the evidence to support a guilty verdict is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal marks omitted).

### 1. Material Misstatement

A violation of 18 U.S.C. § 1001 is comprised of five elements: (1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency. *United States v. Lutz*, 154 F.3d 581, 587 (6th Cir. 1998) (citing *United States v. Steele*, 933 F.2d 1313, 1318-19 (6th Cir. 1991)). Gordon argues that his statement to the IRS in the lien subordination process could not have been material because an IRS lien is

19

always subordinate to a purchase money mortgage. Implicit in Gordon's argument is that the IRS was unharmed.

A statement is material for purposes of § 1001 if it has the natural tendency to influence or is capable of influencing the federal agency. *United States v. Gaudin*, 515 U.S. 506, 509 (1995). It is not necessary to show that the statement actually influenced an agency, but only that it had the capacity to do so. *United States v. Blandford*, 33 F.3d 685, 705 (6th Cir. 1994). Whether the IRS would have issued the subordination does not determine materiality. Moreover, a showing of materiality is a "low bar" for the Government to meet. *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001). "A false statement can be material even if ultimately the conclusion of the tribunal would have been the same." *United States v. DeZarn*, 157 F.3d 1042, 1051 (6th Cir. 1998); *see also United States v. Moss*, 69 F.App'x. 724, 730 (6th Cir. 2003). For example, in *United States v. Markham*, 537 F.2d 187 (5th Cir. 1976), the Fifth Circuit affirmed a conviction under 18 U.S.C. § 1001 where the defendant falsely listed the name of the inventor on a patent application. The approval by the patent office would not have turned on who was the inventor; nevertheless, the court affirmed the conviction.[10]

Gordon pursued two objectives through his communications with the IRS. Gordon's primary aim was to satisfy USBank's request for a certificate of lien subordination. His second goal was to complete the process without alerting the IRS that he intended to purchase a house worth $1,500,000. To accomplish the latter, Gordon represented to the IRS that he intended to purchase

---

[10]Markham was charged under 18 U.S.C. § 1001(a)(1), concealing a material fact, as opposed to the more common charge under § 1001(a)(2). However, the court explained that Markham both concealed material facts and misstated material facts.

20

the Stone Dr. house. Viewing the facts in the light most favorable to the prosecution, a rational trier of fact could have determined beyond a reasonable doubt that lying about which house he planned to buy and how much he intended to pay for it were material misrepresentations. The district court did not err by denying Gordon's motion for acquittal on the §1001 charge.

### 2. Bank Fraud

Next, Gordon argues that no rational trier of fact could have found him guilty beyond a reasonable doubt of bank fraud. Gordon's assertion relies on the idea that submitting fake documents to USBank was not fraudulent because the fake tax returns more accurately stated his income than the false tax returns he filed with the IRS. Essentially, Gordon argues that he never exposed the bank to a risk of loss.

To convict a defendant of defrauding a financial institution under 18 U.S.C. § 1344(1), the Government must prove that (1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured. *United States v. Waldroop*, 431 F.3d 736, 741 (10th Cir. 2005). Gordon need not have exposed or potentially exposed the bank to a risk of loss to be convicted. *United States v. Hoglund*, 178 F.3d 410, 413 (6th Cir. 1999). Consistent with the common law definition of "fraud," § 1344(1) requires "a misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 22 (1999).

The term "scheme to defraud" is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure "from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community."

21

*Spencer v. United States*, 142 F.3d 436, 1998 WL 165142, at *4 (6ᵗʰ Cir. 1998) (unpublished opinion) (quoting *United States v. Ragosta*, 970 F.2d 1085, 1090 (10th Cir. 1992)). Gordon's dealings with the USBank lacked honesty and candor.

Gordon's argument that he did not expose the bank to risk fails for several reasons. First, the bank statements Gordon submitted demonstrating cash on hand dramatically overstated his holdings. This is inconsistent with Gordon's argument that the information he submitted to USBank was accurate. Second, the Supreme Court held in *Neder*, 527 U.S. at 23-25, that a conviction under the bank fraud statute does not require proof of reliance or damages. In the same vein, this Circuit holds that exposing the bank to risk of loss or potential loss is merely one way to prove intent to defraud. *Hoglund*, 178 F.3d at 413. The *Hoglund* panel sustained a bank fraud conviction under 18 U.S.C. § 1344 where the defendant settled his clients' cases without their permission and then signed and deposited the checks into his personal account. The defendant argued that he could not have defrauded the bank because the bank did not lose money through the transactions. The panel disagreed. Similarly, in *United States v. Reaume*, 338 F.3d 577 (6th Cir. 2003), the defendant opened several checking accounts with small initial deposits and used the checks for purchases at large retailers. He then returned the item in exchange for cash. The defendant argued that he intended to defraud retailers but not the bank and therefore could not be guilty of bank fraud. The *Reamue* panel disagreed and affirmed his conviction.

Gordon's argument that he would have qualified for a loan is irrelevant, and, considering the testimony of a USBank representative at trial, likely incorrect.[11] Gordon's contention that the lien subordination was meaningless also fails. USBank insisted Gordon secure it prior to closing the loan. Moreover, the false lien subordination certificate was but one of several misrepresentations made to USBank. Gordon represented to the bank that he had a significant amount of cash on hand, $43,500 in one account and $179,485 in another. The actual balances of the accounts were $100 and $56.86. Additionally, through his fake tax returns, Gordon represented to USBank that he acted honestly in his financial dealings by filing and paying taxes. This was not true. The district court did not err by denying Gordon's motion for acquittal on the bank fraud charge.

### D. Motion for New Trial

Approximately seven (7) months after his conviction, Gordon filed a motion for a new trial that raised several issues. The motion is timely only if relief is based upon new evidence that (1) was discovered only after trial; (2) could not have been discovered earlier with due diligence; (3) is material and not merely cumulative or impeaching; and (4) would likely produce an acquittal if the case were retried. *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982); *see* FED. R. CRIM. P. 33(b). The timeliness requirement must be strictly enforced if invoked by the government. *See Eberhart v. United States*, 546 U.S. 12, 17 (2005) (per curiam).

The district court conducted a hearing where it heard testimony and arguments on the exclusion of witness, prosecutorial misconduct, and jury misconduct. Unconvinced, the district court

---

[11]Tim Maloney, former senior vice-president and regional manager for USBank's Private Client Group, testified if he knew the documents presented in the loan application process were false he would "absolutely not" have approved the loan.

denied Gordon's motion for new trial. Gordon says the district court erred by excluding witnesses and thereby precluding Gordon's ability to present a full defense. It is not clear that any of the evidence presented at the hearing on Gordon's motion for new trial included any new evidence. Rather, it seems Gordon's purpose in calling the witnesses was to retry the case against him. This Court reviews decisions denying a defendant a new trial based on newly discovered evidence for abuse of discretion. *United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006).

### 1. Excluded Defense Witnesses

#### a. Clay Culotta

At the hearing, Gordon argued that the court should have allowed testimony from Gordon's former attorney, Clay Culotta, who Gordon says would have testified that Gordon could not access his bank accounts for purposes of filing taxes because Fifth Third Bank refused to release any information from Gordon's bank accounts pursuant to a hold placed by the IRS. This testimony was offered to rebut the Government's contention that Gordon was capable of determining his tax liability. Gordon did not call Culotta as a witness at the trial. Accordingly, there is no decision of the district court to review and, thus, no abuse of discretion.

#### b. Joe Schaeffer

Joe Schaeffer, an IRS agent, was involved in the 2003 audit of Commonwealth that culminated in the lien against Gordon. At the trial, Gordon sought to elicit testimony from Schaeffer that Commonwealth paid payroll taxes. The district court ruled that Schaeffer's testimony regarding the validity of the lien was irrelevant. At the hearing on Gordon's new trial motion, Gordon suggested that Schaeffer's testimony would have served to reduce his sentence and to rebut the

24

assertion during the Government's closing argument that Gordon had not paid taxes in a decade. The district court did not abuse its discretion in determining that Schaeffer's testimony was irrelevant.

## 2. Prosecutor Misconduct

Next, Gordon argues that the prosecution engaged in witness intimidation that caused several of his witnesses to refuse to testify. Gordon's assertion of prosecutor misconduct centers on a statement made by a prosecutor and overheard by Helen Long, a former Commonwealth employee. Long testified on Gordon's behalf at trial. During cross-examination, the Government asked if she and Gordon had an affair. Long denied a relationship with Gordon. On her way out of the courtroom as she passed by the prosecutor's table, Long states she overheard an assistant United States attorney say to a colleague, "who is going to handle her perjury case?" Gordon argues this statement amounts to witness intimidation. Gordon first raised the issue of witness intimidation in his supplemental motion for new trial.

Gordon attached two affidavits to his supplemental motion for new trial relating to alleged prosecutor misconduct. The first affidavit is from Jeffrey Manning, the subsequent owner of Commonwealth. Manning asserted the statement overheard by Long intimidated him such that he refused to testify for fear of exposure to criminal prosecution. In the second affidavit, Jerry Williams, the family member to whom Gordon transferred the Stone Dr. House in 2004, asserts he similarly refused to testify out of fear of prosecution, after he learned of the comment overheard by Long.

25

In a written memorandum and order denying Gordon's motion for new trial, the district court explained that "government conduct which amounts to substantial interference with a witness's free and unhampered determination to testify will violate due process." Citing *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997). The district court, however, concluded that the remark relayed to Manning and Williams second-hand did not amount to substantial interference. Warning a witness of the consequences of perjury does not amount to interference with the right to testify. *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995).

Finally, the affidavits do not amount to newly discovered evidence, as the witnesses refused to testify during the trial and Gordon would have known of their reasons for refusing through the exercise of due diligence. As the government rightly points out, Gordon's request for a new trial on the basis of witness intimidation was untimely.

### 3. Juror Misconduct

At the hearing on Gordon's motion for new trial Gordon produced an affidavit from his friend and former employee, David Keen ("Keen"). The affidavit said that Keen's estranged wife, Billi Jo Keen, spoke to one of the jurors during the trial. Billi Jo Keen worked for Commonwealth and testified against Gordon at trial. Keen said that Billi Jo Keen reported to him that she recognized one of the jurors as Keen's brother's girlfriend's cousin. According to Keen, Billi Jo Keen said she and the juror laughed about Gordon crying in court. When and where this alleged contact took place is not clear.

A trial court confronted with an allegation of improper contact with a juror during trial "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954). A defendant can obtain a new trial based on a juror's concealment of information during *voir dire* or if he can show actual bias. *United States v. Solorio*, 337 F.3d 580, 595-96 (6th Cir. 2003) (citing *Zerka v. Green*, 49 F.3d 1181 (6th Cir. 1995)).

The district court heard testimony from Keen about his estranged wife's exchange with a juror during trial. The district court expressed doubt as to Keen's credibility based on his testimony at trial. Given Keen's friendship to Gordon, his estrangement from his wife, and his previous testimony, the district court did not abuse its discretion in concluding that the juror did not conceal information during *voir dire* and that Gordon did not present credible evidence of actual bias. Further, Gordon could have called Billi Jo Keen and the juror to testify. FED. R. EVID. 606(b)(1) generally prohibits a juror from testifying regarding his participation in the trial. FED. R. EVID. 606(b)( 2)(B), however, allows a juror to testify as to whether an improper outside influence was brought to bear on any juror. *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997). Gordon failed to present evidence of actual juror bias or any testimony that the district court found credible. Thus, this argument has no merit.

### E. Sentencing

Lastly, Gordon argues that the district court abused its discretion by refusing to grant Gordon more time to prepare for sentencing. Gordon asserts that he did not have time to review the Government's calculations of tax loss and that it incorrectly included business expenses as income.

27

The jury returned a guilty verdict October 22, 2010. The district court sentenced him seven months later. Gordon asked for additional time to prepare; the district court determined that additional preparation would be futile. To affect his sentencing guidelines, Gordon would have to convince the court that the Government's tax loss was less than $400,000. The Government calculated Gordon's tax liability at more than $500,000. The district court noted that even if it credited all of the calculations Gordon asked for, his tax liability would still exceed $400,000. Gordon did not offer a calculation to the district court that would have put his tax liability below $400,000. Similarly, on appeal, Gordon does not state what his sentence is or the sentence he was seeking. He fails to provide any timely or credible explanation of how or why the district court should have arrived at a figure less than $400,000 or what information was unavailable at sentencing that more time would have allowed him to produce. The district court did not abuse its discretion in denying Gordon's request for additional time to prepare for sentencing.

## VII. Conclusion

For these reasons, we affirm the judgment of the district court.