NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0098n.06

No. 14-3269

FILED
Feb 02, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* AMERICAN SYSTEMS CONSULTING, INC., *et al.* | ) ) ) ) | |
| Plaintiffs – Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) ) | COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| MANTECH ADVANCED SYSTEMS INTERNATIONAL, *et al.* | ) ) ) | |
| Defendants – Appellees. | ) | |

Before: GIBBONS and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

DOW, District Judge. Plaintiffs American Systems Consulting Inc. ("ASCI") and Cliff Gallatin, ASCI's CEO, bring this action against Defendants ManTech Advanced Systems International and its wholly owned subsidiaries under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). Plaintiffs appeal the district court's grant of summary judgment in favor of Defendants. We affirm.

I.

ASCI and ManTech are competing providers of technological support services. In June 2005, the Defense Information Technology Contracting Organization ("DITCO") issued a request for proposals ("RFP") for a software and systems engineering contract with the Defense

---

[*] The Honorable Robert M. Dow, Jr., Judge for the Northern District of Illinois, sitting by designation.

Commissary Agency ("DeCA"). The purpose of the contract was to provide DeCA technological support for tracking its inventory. Six offerors submitted proposals, including ManTech and ASCI, the fifteen-year incumbent contractor. ManTech won. Plaintiffs subsequently filed this action against ManTech, alleging that ManTech violated the FCA by identifying a former employee as its prospective Program Manager in its bid.

The RFP required each contractor to designate a single individual with certain qualifications as its prospective Program Manager. The RFP also provided that, should a contractor need to replace its Program Manager, the replacement would be subject to the government's approval. ManTech's proposal, submitted on July 18, 2005, named David Kendall-Sperry as Program Manager and included his resume. The resume stated that Kendall-Sperry had directed IT projects for twenty-five years and worked as ASCI's Project Manager during the company's previous contracts with DeCA. On August 22, Kendall-Sperry tendered his resignation to ManTech to enter the seminary. He worked his last day at ManTech on September 2.

Meanwhile, the government had eliminated two of the six offerors. On Kendall-Sperry's last day of work, the government sent Evaluation Notices ("ENs") to the four remaining offerors, including ASCI and ManTech, requesting further information about their proposals. Plaintiffs contend that ManTech subsequently made two material misrepresentations in violation of the FCA, both regarding Kendall-Sperry. First, ManTech continued to identify Kendall-Sperry as its prospective Program Manager in its EN response, submitted on September 12. Second, ManTech's Best and Final Offer ("BAFO"), submitted on October 3, incorporated ManTech's proposal as previously submitted without disclosing that Kendall-Sperry had resigned.

DeCA's evaluation team, which included Jon Wahlberg, Linda Harrell, Mary Wright, and Tamika Johnson, assessed the various proposals using three factors: Technical and Management Capability, Present and Past Performance, and Cost/Price. In each of their individual evaluations, Johnson and Wright expressly noted Kendall-Sperry's qualifications and gave ManTech a "green" rating for its Technical and Management Capability, the highest rating they could award. DeCA's final report gave ManTech a "green" rating under the Technical Workforce Management subfactor. All of the competing offerors received the same rating, except ASCI. ASCI received a lower "yellow" rating because it failed to address the specific skills of its proposed Program Manager at all. The final report recommended that the government award the contract to ManTech because no offeror exceeded ManTech in Technical and Management Capability and because ManTech offered the lowest price. DITCO—which had solicited the proposals for DeCA, overseen the contracting and procurement process, and reviewed this recommendation—made the final award to ManTech in February 2006.

ASCI subsequently filed a bid protest, and the government again awarded the contract to ManTech in December 2006. ASCI then protested that decision to the General Accountability Office ("GAO"), arguing for the first time in a supplemental submission that ManTech had made misrepresentations regarding Kendall-Sperry. *Id.* The GAO dismissed the submission as untimely, but DITCO subsequently exercised its independent authority to review the arguments itself. After evaluating the submission, DITCO chose to continue under its contract with ManTech.

During discovery in this action, members of DeCA's technical evaluation team explained how they viewed bidders' representations regarding prospective Program Managers. Wahlberg, the team's chairperson, stated that the government neither expected nor required that a

designated individual ultimately perform as Program Manager, as a company's employees were free to terminate their employment at any time. He further stated that the government used employees' resumes only as a representation of the skill level, knowledge, and experience of the personnel that the bidder was capable of offering. Wright testified that Wahlberg similarly instructed her to use resumes only as an indication that the bidders had personnel capable of performing as qualified Program Managers.

Viewing the bidding process retrospectively, Wahlberg further stated that his evaluation of ManTech's proposal would not have changed had he known of Kendall-Sperry's resignation. In the government investigation that followed the bid protest, DITCO Contract Specialist Patricia Darian similarly stated in an e-mail that the initial decision to choose ManTech was not based on ManTech's use of a particular Program Manager. DeCA's Contracting Officer Representative ("COR"), Yolanda Bowden, testified that the inclusion of Kendall-Sperry's name and resume in ManTech's proposal would have indicated to her that Kendall-Sperry was going to be ManTech's Program Manager. Bowden had facilitated the bidding process and attended evaluation sessions, but she had not participated in the team's evaluation.

On cross-motions for summary judgment, the central issue before the trial court was whether ManTech's EN responses and BAFO included material misrepresentations in violation of the FCA. The district court granted summary judgment for ManTech, concluding that the alleged misrepresentations regarding Kendall-Sperry were immaterial as a matter of law. The court's rationale was three-fold. First, in viewing the RFP's pre-approval provision, the district court concluded that the RFP expressly contemplated that the designated Program Manager might change. Second, Wahlberg, Wright, and Darian's statements consistently indicated that the award was uninfluenced by the alleged misrepresentations. Third, the government decided to

4

continue working with ManTech after learning of the alleged misrepresentations. In arriving at its conclusion, the district court excluded the report of Plaintiffs' expert witness, Anthony Perfilio. This appeal followed.

## II.

We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences in favor of the nonmoving party. *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). Summary judgment is proper where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.; see also* Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## A.

The False Claims Act provides, in pertinent part, that that any person who

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

is liable to the United States government. 31 U.S.C. § 3729(a)(1). Although the statute does not include an express materiality requirement, we have held that "false statements or conduct must be material to the false or fraudulent claim to hold a person civilly liable under the FCA." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 442 (6th Cir. 2005). A false statement is material if it has "the objective, natural tendency to influence a government decision maker." *United States v. United Technologies Corp.*, 626 F.3d 313, 321 (6th Cir. 2010).

5

On appeal, Plaintiffs at least suggest that the district court erroneously granted Defendants summary judgment because materiality is a question reserved for the jury. To the extent that they so argue, we conclude otherwise. We have not explicitly addressed this question in previous cases, but our prior decisions indicate that a judge may decide materiality as a matter of law. To begin with, we previously affirmed a district court's grant of summary judgment for plaintiffs bringing an FCA claim, thereby strongly implying that judges may determine materiality. *See United States ex rel. Wall v. Circle C Const.*, *L.L.C.*, 697 F.3d 345 (6th Cir. 2012). In addition, we have held that materiality under 18 U.S.C. § 1001 is a question of law for courts to decide. *See, e.g., United States v. Keefer*, 799 F.2d 1115, 1126 (6th Cir. 1986); *United States v. Chandler*, 752 F.2d 1148, 1151 (6th Cir. 1985). Finding no reason to contradict the assumption that underlies *Wall* or to distinguish materiality under the FCA from materiality under § 1001, we hold that a judge may decide as a matter of law whether a misrepresentation was material under the FCA.

B.

Plaintiffs also argue that the district court improperly granted summary judgment because there was a genuine dispute as to two material facts: (1) whether the government used Kendall-Sperry's resume as an indicator of the kind of person, not the particular person, who would become ManTech's Program Manager and, relatedly, (2) whether the government would have made a different decision had it known of Kendall-Sperry's resignation. As explained below, Plaintiffs need not prove that the government would have made a different decision in the absence of the alleged misrepresentations—a showing required under the Eighth Circuit's outcome materiality test. *See United States ex rel. Costner v. United States*, 317 F.3d 883, 887 (8th Cir. 2003). To prove materiality in this circuit, Plaintiffs need only demonstrate that the

6

alleged misrepresentations had an objective, natural tendency to affect the government's decision. *United Technologies Corp.*, 626 F.3d at 321.

1.

Reviewing the evidence *de novo*, we find no genuine dispute as to the first fact. Wahlberg's and Wright's testimony make clear that the government viewed Kendall-Sperry's resume as a sample of what ManTech could offer, not as a promise that Kendall-Sperry himself would become Program Manager. According to Wahlberg, the government recognized that personnel are free to leave their employers at any time, so a given Program Manager might change. Wahlberg and Wright explained that, with this consideration in mind, they only used Kendall-Sperry's resume as a general indicator of the human capital that ManTech could provide.

The RFP's provision requiring the government to pre-approve a replacement manager is consistent with Wahlberg's and Wright's statements. Read in light of their testimony, it indicates a reliance interest in the general qualifications, not the specific identity, of the manager. As the district court put it, this "provision comports with reality. Sometimes people change careers, quit, retire, become ill, die or go to seminary. If it was significant to the Government that a specific individual serve as Program Manager for the SSESS contract, it could easily have stated such a requirement in the RFP." Dist. Ct. Op. at 11-12.

Plaintiffs argue that the RFP's language contradicts their testimony because it required contractors to designate a single individual with certain qualifications as Program Manager. This language is consistent with Wahlberg's explanation that the RFP required offerors to present one individual as a sample Program Manager. Plaintiffs also point to the fact that the final evaluation gave ASCI a lower ranking because it failed to address the specific skills of the proposed

7

Program Manager. This argument strikes us as cutting against Plaintiffs, not in their favor. The record here shows that the evaluators of the competing RFPs focused on the Project Manager's qualifications as a proxy for the applicant's overall human capital. In failing to address the specific skill set of its proposed Program Manager, ASCI neglected to give the decision makers precisely what they testified they needed to determine whether the Project Manager's background was representative of the human capital that ASCI could provide. Given the importance of that omitted information to the evaluators, a lower ranking seems unsurprising. Finally, Plaintiffs argue that Wright's and Johnson's evaluations contradict Wahlberg's and Wright's statements. But the evaluations merely summarized Kendall-Sperry's qualifications and gave ManTech a "green" rating. By noting his qualifications, the evaluations did not indicate that the government understood those qualifications to be anything more than a sample of what ManTech could offer.

2.

Our conclusion that the government decision-makers viewed Kendall-Sperry's resume as a representative sample of ManTech's capabilities disposes of the second issue of fact identified by ASCI; assuming that the government did not require or expect Kendall-Sperry specifically to perform as Program Manager, his resignation would not have affected the contract award decision. The remaining evidence is consistent with this conclusion. Darian explicitly stated that the alleged misrepresentations regarding Kendall-Sperry did not affect the government's decision, and Wahlberg consistently testified that his evaluation of ManTech's proposal would not have changed had he known that Kendall-Sperry was no longer employed by ManTech. DITCO's subsequent decision to continue contracting with ManTech after learning of Kendall-Sperry's departure, which is relevant to determining the influence of the alleged

8

misrepresentations on the government's decision at the outset, coincides with Darian's e-mail and Wahlberg's statement that the departure of the proposed Project Manager had no effect.

Plaintiffs argue that Bowden's testimony indicates that the misrepresentations did affect the government. But Bowden merely testified that she would have interpreted the inclusion of Kendall-Sperry's resume to mean that Kendall-Sperry would become the Program Manager. Bowden's interpretation makes sense, and any person reading the application could draw the same conclusion. But the actual decision-makers stressed their understanding that people change jobs and thus the departure of a specifically-identified Program Manager would not affect their decision as long as they felt the company retained the general capabilities reflected in the identified Program Manager's skill set. Nothing Bowden said casts any doubt on those propositions or gives us any reason to believe that Bowden could offer competent evidence challenging the other decision-makers' consistent testimony that they remained convinced of ManTech's suitability to perform on the contract both before and after they learned of Kendall-Sperry's departure. Indeed, Bowden did not participate in the team's evaluation, nor did she address the team's actual evaluation process. She only stated how she personally would have viewed the proposal on its face. In light of her peripheral role in the selection process, the nature of her testimony, and the consistent evidence that ManTech's representations regarding Kendall-Sperry had no effect on the actual government decision-makers, Bowden's testimony does not create a genuine dispute of fact. "The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d

9

476, 479 (6th Cir. 1995)). No reasonable jury could find for ASCI on the basis of Bowden's innocuous statement.

C.

Turning to whether ManTech was entitled to judgment as a matter of law, we now consider Plaintiffs' argument that the district court erroneously applied a subjective rather than an objective standard of materiality. As previously stated, a false statement is material if it has "the objective, natural tendency to influence a government decision maker." *United Technologies Corp.*, 626 F.3d at 321. The district court recited this test, but in applying it, the court emphasized that the actual government decision-makers were uninfluenced by the alleged misrepresentations. In particular, the district court focused on (1) Wahlberg's statement that there was no expectation or requirement that the designated individual ultimately perform as Program Manager; (2) both Wahlberg's and Wright's statements that the government only used employees' resumes for representative purposes; (3) Darian's e-mail explaining that the actual award was not based on ManTech's designation of Kendall-Sperry as Program Manager; and (4) the government's decision to continue working with ManTech after discovering the alleged misrepresentations. Plaintiffs contend that the district court's emphasis on what the actual decision-makers said and did shows that the court applied a subjective rather than an objective test of materiality.

We disagree. Much of the evidence in the record is indeed subjective, but in the absence of any indication that the actual decision-makers acted unreasonably, their statements remain highly relevant to any objective inquiry. Statements by the actual decision-makers may be (and often are) the best available evidence of whether alleged misrepresentations had an objective, natural tendency to affect a reasonable government decision-maker, especially if they are

10

consistent with a rational decision-making process and a common sense reading of the record as a whole. Here, nothing in the record about the actual decision-makers (or their decision-making process) suggests a gap between their subjective views and the hypothetical views of a reasonably objective government decision-maker. For example, there is no evidence of bias, conflict of interest, irrationality, or ineptitude on the part of the decision-makers. Nor is there any evidence that the decision-makers disregarded any statute, regulation, guideline, or procedure in their approach to the bids and the role of the Project Manager in them. In short, the approach to awarding the contract taken by the decision-makers in this case comports with what we would expect of reasonable decision-makers. Accordingly, we conclude that ManTech's representation in the RFP that Kendall-Sperry would serve as Project Manager and its failure to update the RFP after his resignation would have no natural tendency to influence a reasonable decision-maker awarding the contract at issue, and we thus affirm the district court's finding of immateriality.

D.

Plaintiffs also argue that the district court erroneously applied the outcome materiality test rather than the natural tendency materiality test. In *A+ Homecare,* we adopted the latter and rejected the former. *A+ Homecare, Inc.*, 400 F.3d at 445. Under the outcome materiality test, a statement or conduct is material if it had "the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due." *Id.* (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998)) (internal quotation marks omitted). Where a plaintiff cannot show that the government would have acted differently had it known of the misrepresentation, there is no false claim under the outcome materiality test because the government's action would have occurred

11

regardless. *Id.* (citing *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563 (8th Cir. 1997)). In contrast, the natural tendency test "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered." *A+ Homecare, Inc.*, 400 F.3d at 445 (citation and quotation marks omitted).

The district court concluded that DITCO's decision to continue working with ManTech after discovering Kendall-Sperry's resignation "precludes" a finding that ManTech's failure to disclose was material. Dist. Ct. Op. at 15. Contrary to Plaintiffs' assertion, this reasoning does not apply the outcome materiality test. A court applying that test would have required Plaintiffs to show that ManTech would *not* have won the contract but for the alleged misrepresentations. The district court neither expressly nor impliedly required Plaintiffs to make this showing. Instead, it found that the government's subsequent decision to continue working with ManTech precluded a finding of materiality.

To be sure, we do not agree with the district court's reasoning that DITCO's decision *necessarily* precludes a finding of materiality. When the government discovers misrepresentations made during contract formation, a subsequent decision not to terminate may weigh against a finding of materiality, but it is not always dispositive. Circumstances can change between a decision to enter into a contract and a subsequent decision not to terminate it, and the extent of any such changes would bear on the inquiry. The government may make operational changes or investments in reliance on the agreement. Alternative contractors may enter other deals, reducing the supply of available contractors and making it more costly for the government to find a replacement. The costs associated with implementing another bidding process at the last minute also may be significant. In these circumstances, among others,[1]

---

[1] The Fourth Circuit has provided further examples in arriving at the same conclusion.

12

termination could cause incremental losses that exceed the benefits, making a decision not to terminate a poor indicator of materiality at the outset.

The purpose of the FCA—"policing the integrity of the government's dealings with those to whom it pays money," *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003)—also counsels against a categorical approach to materiality. As the Fourth Circuit explained in *Harrison*, courts give effect to the FCA by holding a contractor liable where its misrepresentations have a natural tendency to influence the government's decision; contractors who make such misrepresentations are not protected by the government's subsequent decision to continue working with them, for whatever reason. *See id.* To find otherwise could lead to perverse outcomes; the more dependent the government became on a fraudulent contractor, the less likely it would be to terminate the contract (and the less likely the contractor would be held liable). Accordingly, a decision to continue under a contract after discovering misrepresentations is not necessarily dispositive.

With that said, the circumstances that might give us pause in linking DITCO's decision to continue working with ManTech to a finding of non-materiality do not appear in this case. Nothing in the record indicates that DITCO affirmed the contract because changed circumstances made termination more costly than continuing to work with ManTech. In fact, DITCO affirmed

---

> [W]e can foresee instances in which a government entity might choose to continue funding the contract despite earlier wrongdoing by the contractor. For example, the contract might be so advantageous to the government that the particular governmental entity would rather not contest the false statement, even if it became aware of the false statement before the subcontractor began its work. Also, the government might decide not to address a conflict of interest that it first discovers several months after the subcontractor begins work. At that point, to avoid further costs the government might want the subcontractor to continue the project rather than terminate the contract and start over.

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003).

the contract *pre*-performance. DITCO's decision does not by itself dispose of the materiality question, but it does provide further support for the district court's immateriality ruling, which we affirm because (as explained above) the alleged misrepresentations would not have had a natural tendency to influence a reasonable decision-maker awarding the contract at issue.

III.

Finally, we address Plaintiffs' contention that the district court erred in excluding Plaintiff's expert report. We review that ruling for an abuse of discretion. *Rolen v. Hansen Beverage Co.*, 193 F. App'x 468, 472 (6th Cir. 2006). Plaintiffs argue that the district court erred in granting ManTech summary judgment without first allowing Plaintiffs an opportunity to argue that the report was admissible under Rule 702 of the Federal Rules of Evidence.

Plaintiffs first offered the report in their motion for summary judgment. In ManTech's response brief, filed on May 28, 2013, ManTech argued that the report was inadmissible. Plaintiffs' reply brief, filed on June 14, 2013, failed to respond to that argument. ManTech subsequently filed both a reply brief in support of its summary judgment motion, again arguing that the report was inadmissible, and a separate motion to exclude Perfilio's report in August 2013. Again, Plaintiffs did not respond. In an order entered on December 11, 2013, the district court set a trial date of May 12, 2014. On February 27, 2014, it entered an opinion and order granting ManTech's motion for summary judgment.

Plaintiffs indicate that they did not respond to ManTech's arguments targeting the expert report because they expected the district court to address the expert issues in motions *in limine* closer to trial.[2] This was a risky strategy; we are unaware of anything in the case management

---

[2] In particular, Plaintiffs submit that they expected a hearing based on the district court's pre-trial scheduling orders, citing a December 2013 order that required the parties to file any motions challenging the admissibility of expert testimony no later than sixty days before trial and stating that the district court would conduct a hearing on any *Daubert* motions before the pre-trial conference.

orders preventing ManTech from arguing as it did at the summary judgment stage that the expert opinion was irrelevant and/or unreliable. Given that Plaintiffs themselves chose this strategy, we are unpersuaded by their contention that the district court should have allowed them to respond to ManTech's arguments. Almost nine months passed between ManTech's argument that the report was inadmissible and the district court's opinion and order granting ManTech's motion for summary judgment. If Plaintiffs wanted to argue that the Perfilio report was admissible, they could have made this argument either in their reply brief or in a response to ManTech's motion to exclude the report. For this reason, Plaintiffs' citation to the Tenth Circuit's decision in *United States v. Nacchio*, 519 F.3d 1140, 1154 (10th Cir. 2008) for the proposition that the proponent of expert testimony "must be given an opportunity to [carry its burden] before the testimony may be ruled inadmissible" misses the mark. Plaintiffs *did* have that opportunity. We have consistently held that "a reviewing court should not consider issues in the first instance when they were not litigated in the trial court except in exceptional circumstances." *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 753 (6th Cir. 2012) (citation omitted). Because Plaintiffs do not explain persuasively why their circumstances are exceptional, we conclude that they have forfeited their argument.

In any event, the district court did not abuse its discretion in excluding Plaintiff's proposed expert testimony or in making that determination at the summary judgment stage. The district court clearly felt that Perfilio's report read like a "memorandum of law" and rested on facts that contradicted the testimony of the fact witnesses. Both of these flaws are recognized bases for excluding proposed testimony under Rule 702 and apply at least arguably to the testimony at issue. *See*, *e.g.*, *United States v. Gordon*, 493 F. App'x 617, 626-27 (6th Cir. 2012) (citation omitted) ("legal conclusions . . . [are] properly excluded"); *Greenwell v. Boatright*, 184

F.3d 492, 497 (6th Cir. 1999) ("Expert testimony . . . is inadmissible when the facts upon which the expert bases his testimony contradict the evidence."). Perhaps reasonable minds could disagree on whether the district court should have excluded the entire report or separated admissible wheat from inadmissible chaff, considering at least part of the opinion. Even so, the issue raises at most a debatable question, offering no basis for overturning the ruling below given the standard of review.

IV.

For the reasons stated above, we affirm the district court's grant of summary judgment in favor of ManTech.